In the Matter of J. RICHARD DAVIS, an Attorney, Respondent.

First Department, November 5, 1937.

*Irving Ben Cooper* of counsel [*Irving Brawer* and *Abraham M. Bloch* with him on the brief], for the petitioner.

*Terence J. McManus* of counsel [*John J. Foley* with him on the brief; *McManus, Ernst & Ernst*, attorneys], for the respondent.

MARTIN, P. J.  The respondent was charged with having aided and abetted the form of gambling known as "policy" or the "numbers racket" and acting the role of advisor, counselor and friend to gambling and criminal combinations engaged therein.

We use the word "racket" throughout this opinion not through choice, but because that term was used during the hearing to describe the activities of those conducting and controlling the game of policy.

It is asserted that respondent represented numerous defendants charged with violations of section 974 of the Penal Law, without having been retained by them and without their knowledge and consent previously obtained, pursuant to agreements made with the bankers, controllers and other persons engaged in the "numbers racket," whereby he undertook generally to represent them and their subordinates when arrested.  The petitioner alleged that the respondent appeared in hundreds of policy cases in the past eight years, for which services he received payment from the bankers and made no effort to exact payment from persons for whom he appeared.  The respondent denied substantially all the allegations of the petition.

The petitioner adduced evidence which outlined in a general way the method of conducting the "policy racket" or "numbers game."  The banker (the person or group controlling the game) engages the services of collectors who solicit the public in an effort to induce persons to play the "numbers."  If the banker has a large number of collectors and an extensive "play" he engages "pick-up" men or "controllers" who are the connecting link between the banker and the collectors.  Under this arrangement the collectors do not meet the banker.

A player may select any numbers from "000" to "999" and wager thereon any sum from a cent to a dollar.  One witness testified that a "plunger" might occasionally wager as much as five dollars.  When the wager is made the collector prepares a slip in duplicate setting forth the number selected and the amount wagered.  The player keeps one slip and the collector the duplicate.  After deducting his commission the collector turns the slips and

the balance of the money over to the " controller " or " pick-up man " who, in turn, retains his commission and delivers the slips and the balance of the money to the banker. A drawing is held each day. There are different methods of selecting the " winning number." Some bankers use the last three figures of the amount reported in the daily newspapers as the balance of the New York Clearing House. In any event, by some system, a winning number is chosen and all players who wager on it are paid five hundred or six hundred times the amount wagered. The method of payment is for the banker to return the winning slip and the money to the controller, who turns them over to the collector who has procured the wager. The latter personally pays the winner. It may be here noted, however, that very few of the poor unfortunate people who play the game of policy ever win. The odds are one thousand to one that the number selected by the player will not be the winning number. As a rule the holder of the winning number is required to pay to the collector a small percentage of his winnings. Out of every thousand dollars collected there is a profit of about four hundred dollars.

Forty-two of the witnesses called by the petitioner testified to having been arrested for activities in connection with the " numbers game " or " policy racket." They testified that in each instance bail bonds were furnished for which the premium was paid by some person whom they did not know. When called to court for trial the defendants were advised by some unknown person to plead guilty and did so. They were either fined or sentenced to prison. In most instances fines were imposed, in which cases some unknown person paid the fines.

For the purpose of illustration, we will note a case typical of the many which were proved at the hearing. Francesco Matteo testified that he was a " collector " in the policy game; that he gave his slips to a man known to him as " Tommy;" that at the suggestion of " Tommy " he went to 351 Lenox avenue, New York city, where he was given a card by a man whom he did not know. " Tommy " told the witness that the card was a " protection card " and that if " anything happened " to him, " Tommy " would " try to help " the witness. Thereafter Matteo was arrested and bailed out, although he did not ask for bail or pay the premium on the bond. His testimony is in part as follows: " Q. Did you put up the bail? A. No, sir. Q. Did you ask anybody to? A. No. Q. Did it cost you any money? A. No. Q. Did you pay anybody for it? A. No."

Matteo further testified that he did not engage a lawyer and did not know whether or not he had a lawyer in Special Sessions Court, New York county, when his case came on for trial. He was fined fifty dollars; the fine was paid but not by him. He did not know by whom it was paid. The court stenographer who took the minutes of Matteo's trial testified that the defendant was represented by one Martin Weintraub, an employee of the respondent.

Notwithstanding a rule of the Court of Special Sessions which required every attorney appearing for a defendant in that court to file a written notice of appearance, the court records disclosed that except on rare occasions such notices of appearance were not filed. In order to show the great number of policy cases in which the respondent represented defendants, the petitioner called two stenographers who testified that they took the minutes of trials in the Court of Special Sessions. They testified that they knew the various lawyers appearing in cases in that court and noted at the beginning of each trial the name of the attorney who appeared on behalf of the defendant. The testimony of these stenographers disclosed the fact that, although the respondent personally appeared in comparatively few such cases, the defendants in a great number of cases were represented by Martin Weintraub, also known as " Moe " Weintraub, who was an employee of the respondent.

The records indicate that in 1932 Weintraub appeared in 430 policy cases out of a total of 1,944; that in the year 1933 he appeared in 623 policy cases out of a total of 3,564.

Weintraub, called as a witness by the petitioner, said he and the respondent had been classmates in law school and upon their admission to the bar had shared offices where they engaged in the general practice of the law. Thereafter they discontinued this arrangement. In 1930 the witness was employed by the respondent to " handle his business " in the Court of Special Sessions. He was paid seventy-five dollars a week for this work and on occasions was given extra compensation. Weintraub said he would obtain a daily calendar of the cases he was to defend by going to or telephoning the respondent's office, or a list of such cases would be handed to him in court. Upon his arrival at the court on the morning of the trial, he would for the first time meet the defendants whom he was to represent. Weintraub testified that during 1932 and 1933 at the request of the respondent he acted as attorney in approximately twenty policy cases a week. This would total 2,080 cases " handled " by him for the respondent in the two-year period. When Weintraub was confronted with the records showing the correct number of policy cases tried in the Court of Special Sessions,

he said that the stenographer's records were more accurate than his guess. Although Weintraub greatly overstated the number of cases in which he appeared, it is undisputed that he did appear for the defendant in a very large number of cases.

The referee found that none of the witnesses who testified for the petitioner directly connected the respondent with any person shown to be directing the " policy racket." He reached the conclusion, therefore, that there was no evidence to sustain the charges against the respondent.

We reach a different conclusion. There is a compelling inference that the respondent appeared, through his representative, Weintraub, in several hundred cases. The stenographic records show that in each of the forty-two cases testified to by defendants they were represented by Weintraub whom the respondent employed to try policy cases. In thirty-six of the forty-two cases the defendants testified that they did not know Weintraub and had never retained him.

On February 21, 1935, the respondent was examined by the commissioner of accounts. He admitted at that hearing that he " handled " about four or five policy cases a day and that in about nine out of every ten cases bail was furnished for the defendants. He said, however, that he did not know by whom the bail was furnished.

Davis was asked how he happened to take up the practice of defending persons charged with violations of the law relating to the game of policy. His explanation was that upon removing his office to the vicinity of the One Hundred and Fifty-first Street Court " I became acquainted with a lot of people who were interested in people who were arrested for policy and they retained me from time to time." He testified that he would not know who engaged him, that " It might have been someone who represented the banker, but they pretended to be friends or interested in the party under arrest and they would retain me." The respondent admitted that he knew Ike Adelman, a bondsman who " introduced me to quite a few people who gave me business." He admitted the business was connected with the policy game and that some of the people were introduced as " bankers." He stated: " They were referred to as bankers, whether they were or not I don't know."

The respondent testified at the same hearing to his knowledge of the policy game and his acquaintance with those interested in it. " Q. As a result of your activities as an attorney representing these defendants who were entitled to legal representation under the law, you came to know a lot of those in back of the collectors, didn't you? A. I don't know what you mean when you say I

came to know a lot of those in back of them. I did know a lot of people in Harlem, a lot of collectors. I also know a lot of collectors and I knew a lot of people interested in them. Of course, I did not know that they were bankers, I didn't know that. Q. At any rate, you became quite familiar with the operations of the game? A. Yes. Q. That was perfectly natural. What I mean is this, Mr. Davis, you met from time to time the collectors of the policy game who were quite active up in Harlem? A. Yes, I believe I represented quite a few. * * * Q. How about the controllers? A. I don't doubt that I represented quite a few of the controllers. Q. And as a result of your activities as a lawyer in connection with these cases, you became familiar with the so-called bankers? A. Well, when you say I became familiar with them, I can't say definitely that I became familiar with the bankers. There were quite a few people who retained me. Whether or not they were bankers I would not know. They had an interest in these defendants. Sometimes when a collector was arrested, the controller would retain me and he might pay me for the case, or the collector himself would pay me, or sometimes a relative of his. I will say that I did know a lot of people in Harlem who were interested in the policy game in some form or other, but I did not know whether they were bankers or not. * * * Q. Who engaged you to defend these persons, was it themselves or some other person? A. It was usually impossible to see the defendants because they were in prison under arrest and were not out on bail. It was usually some relative or some friend who had an interest in the defendant who would come to me and engage me. Q. Who in particular engaged you, would it be relatives of these collectors or was it somebody representing the bankers or the controller under whom the collector worked? A. I would not know that. It might have been somebody who represented the banker, but they pretended to be friends or interested in the party under arrest, and they would retain me."

Speaking of controllers and bankers he testified as follows: " Q. They would give you the names of the persons who were arrested. A. They would say ' So and so has been arrested. Will you take care of it and see him on the arraignment?' And I would see to the matter, and I was paid either by the defendant or by the man who asked me to defend him."

The respondent testified before the grand jury, New York county, on April 3, 1935. He then stated that he had heard that George Weinberg and a man named Pompez or Pompei " were partners and bankers in policy in Harlem." On the hearing before the referee he admitted the truth of the foregoing statement and then

testified, " George Weinberg recommended people that were arrested for policy whose cases I handled." When testifying before the commissioner of accounts the respondent admitted that for " a couple of years " Weinberg referred to him the cases of defendants arrested for violation of the " policy " laws. In explaining the method of payment to him for his services in the cases recommended by Weinberg he said, " Usually I would be paid by the defendant, when I was not, he paid me."

We thus have the testimony of the respondent that he had been hired by the controllers and the bankers in the policy game to defend their subordinates. He claimed, however, that he was not under a general retainer agreement but that he was retained as each case arose. While there is no direct proof of such general retainer, everything points either to such a retainer or to a working agreement whereby the same end was attained. The respondent frequented the office that was notorious as the headquarters of the " Numbers Racket " and he there consorted with " Bo " Weinberg, George ᴇWeinberg and Abe Landau, members of the Dutch Schultz gang, operators of the " Policy Racket." He was the personal counsel to Dutch Schultz (Arthur Flegenheimer).

With reference to the so-called " numbers " office at 351 Lenox avenue, New York city, it is interesting to note that from 1931 to 1935 there was located at that address what was ostensibly a bail bond office. In reality it was the headquarters of the persons who operated and controlled the policy " racket." Prior to 1933 an office was maintained there in the name of Louis Koch, a bondsman. He was succeeded by Leo Zupnick, the respondent's brother-in-law, who was also a bondsman and received help from the respondent. In this connection Davis testified: " Q. Leo Zupnick is your brother-in-law? A. Yes. Q. And he was in the bail bond business? A. Yes. Q. He had occasion to bail out a great number of people in the policy business? A. I know he bailed out a lot of people. I never went into the details with him. He was earning a living. I was helpful to him in getting him his powers. I believe I guaranteed — Q. He had previously no connection with bail or anything relating to it? A. No. He had gotten out of work and being married to my sister, the burden fell on me and I said, ' Become a bondsman. The others are making money and you should.' "

The respondent admitted he was familiar with 351 Lenox avenue; that he frequently visited the premises in the years 1931 to 1934; he described conditions existing there and named persons who frequented the place. He testified: " Q. You say that at 351 Lenox Avenue there were collectors and controllers who you had yourself represented? A. Yes, and others whom I had heard of,

and I knew some of them. Q. You knew some of these other collectors even though you did not represent them? A. That is right."

The evidence leads to but one conclusion. The respondent was allied with Dutch Schultz and others conducting the " policy " racket and had an agreement to defend any of their subordinates who might be arrested in connection therewith. In any event, he undoubtedly was accomplishing the same result, with or without a definite retainer.

This conclusion is irresistible when consideration is given to a mass of important evidence consisting of telephone conversations heard over tapped wires, which evidence the referee refused to consider, holding it was obtained in violation of section 1423 of the Penal Law. It is important to note that the wires were not tapped by the commissioner of accounts or the petitioner but by Federal agents and police officials before this proceeding was commenced in an effort to obtain information concerning Dutch Schultz when he was a fugitive from justice. It was not even contemplated at that time that charges would be preferred against the respondent. If the commissioner of accounts had tapped the wires of respondent or of any attorney or of any citizen a very serious situation would arise.

It is the law in this State, however, that evidence obtained by means of tapped wires is admissible. (*People* v. *McDonald*, 177 App. Div. 806, 809.) In *People* v. *Defore* (242 N. Y. 13) the Court of Appeals, in an opinion by Judge CARDOZO, held that the fact that evidence had been illegally obtained did not affect its admissibility.

The referee rejected the aforesaid authorities on the ground that they involved criminal cases. He pointed out that the evidence is of the kind which Mr. Justice HOLMES in his dissenting opinion in *Olmstead* v. *United States* (277 U. S. 438, 470) characterized as " dirty business." We realize the danger of indiscriminate wire-tapping and its consequences. This is especially true when the wires of a lawyer's office are tapped. Not only the business of the attorney is disclosed but that of every person who calls the attorney. By that means the privileged communications and conversations as well as the secrets of his clients and their private business is pried into by strangers.

The dissenting opinion by Mr. Justice BRANDEIS in the *Olmstead* case (*supra*) forcibly points out the dangers of wire-tapping. He said: " Whenever a telephone line is tapped, the privacy of the persons at both ends of the line is invaded and all conversations between them upon any subject, and although proper, confidential

and privileged, may be overheard. Moreover, the tapping of one man's telephone line involves the tapping of the telephone of every other person whom he may call or who may call him. As a means of espionage, writs of assistance and general warrants are but puny instruments of tyranny and oppression when compared with wire-tapping."

We agree with the referee and attorney for the respondent that reckless and unwarranted wire-tapping in pursuit of a system of espionage by governmental agents cannot be too strongly condemned. All offenders who resort to such methods for the purpose of spying on private citizens or public men should be severely punished.

This, however, is not such a case. No wire-tapping was resorted to in this proceeding. Evidence previously obtained by Federal and police officers in searching for notorious criminals was produced. That such evidence is admissible has been clearly held by our Court of Appeals.

The importance of this testimony is shown in one of the conversations which a witness testified he overheard on a tapped wire. A particular matter was discussed in detail and then the following statements were recorded by the witness: " Joe: Where can I see you or get you? Dick (The respondent, Davis): At the numbers office between 2 and 3 University 8127 or better still or at Academy 2–1262 at one o'clock, get me."

The telephone company's representative stated that University 4–8127 was at 351 Lenox avenue in the name of L. Koch, bailbonds, from 1932 to 1935, and that University 8127 was listed at the same address. Davis himself admitted that Academy 2–1262 was his mother's telephone number.

The following conversation, obtained by a police officer over a tapped wire directly connects the respondent with the promoters of the " policy racket:" " George Weinberg called Dick Davis at Chickering 4–3474. They spoke about starting the policy game up in Westchester — Mt. Vernon and White Plains. George told Dick it was a good spot, and that he had been speaking to Augie about it. George spoke to Dick about renting an office in Mt. Vernon and told him it would cost $800 a month for police protection. George told Dick that Augie had told him that the combine wanted 25% and Dick told George that 20% would be enough. Dick told George that he would meet George and Augie at the Borough Hall in Mt. Vernon."

Although the respondent denied this conversation, it was taken over his own telephone wire by the same officer who heard and recorded many other conversations in which the respondent admitted

he participated, all of which were very important and connected the respondent with those operating the policy game. The officer, an entirely disinterested witness, recognized respondent's voice.

There were found in the possession of Dutch Schultz (the policy racket operator) documents bearing the names of persons whom the respondent represented or with whom he had transactions relating to some phase of the "policy racket." Respondent admitted that he had heard of Schultz being connected with the "policy" game.

We appreciate that it is difficult if not practically impossible to obtain direct evidence of charges such as those herein involved. Such charges may, however, be established by circumstantial evidence. In the Supreme Court of Pennsylvania, in 1936, a series of disbarment cases were decided which are strikingly similar to the case at bar. In *Matter of Salus* (321 Penn. St. 106; 184 A. 70) the court said:

" It is obvious that direct proof of such agreement is difficult to obtain. The bankers in this type of crime have successfully avoided arrest and cloaked their own connection with the lottery in a veil of secrecy, even from many of their employees. None of the number writers who were arrested could testify as to the identity of their banker. When, therefore, we have the proven facts that an office is frequently retained to represent parties whom they do not know and who do not know the attorneys before trial, and where the defendants themselves did not arrange for this representation or pay any fee and no fee is demanded, and no friend or relation is shown to have procured the services, plainly a legitimate inference may be drawn that the connection of the attorney in these cases is the result of some prior arrangement with the bankers. It is the latter who are anxious to protect the number writers so that they will have no cause for dissatisfaction and no occasion to disclose the operations of the system or the identity of parties by whom they are engaged.

" It was incumbent upon appellant to explain away the unusual circumstances which attended his representation of so many parties engaged in the same type of crime. His direct admission that Baron employed him on many occasions is tantamount to a confession that he had entered such arrangement with Baron, and the Judges below could not, nor may we, accept his statement that he did not know whether Baron was in the numbers game."

It is true that in the above cited case there is testimony that the attorney's firm had represented those who were " higher-ups " in the " numbers racket " and had represented a half dozen cases in which a known banker had requested the attorney's services and

paid the fees. It would seem, however, that if in the case cited the fact that the attorney was admittedly hired on many occasions by a known banker would give rise to an inference that he had a general arrangement with said banker, then in this case the inference would equally arise that this respondent had an arrangement with those controlling the policy racket from the fact that he represented a great many defendants whose cases were recommended by a " banker; " that the latter paid the respondent's fees if the defendants failed to do so; that many of the defendants represented by respondent did not hire him and did not know by whom he had been hired; that bail bonds were furnished in most of these cases and that the defendants therein did not pay the premium thereon and did not know who had done so; that the respondent consorted with the persons who controlled the " numbers racket " and frequented what he called the " numbers " office in which his brother-in-law conducted a bail bond business.

When properly retained lawyers have a right to defend persons charged with crime. They must realize, however, that aiding or abetting the commission of crime will not be tolerated. They may not, as did the respondent, undertake to defend persons for offenses thereafter to be committed and thereby encourage the perpetration of crime. The license to practice law does not permit attorneys to engage in criminal activities with their clients nor does it permit them to aid or abet the commission of crimes. It is drawing on the imagination to contend that such practice as was here disclosed is comparable to a general retainer by an association representing persons and corporations engaged in a lawful business whereby the attorney so retained is authorized to appear for and defend members of the association whenever they are sued either civilly or criminally for acts in connection with the prosecution of their business and without being specifically retained on each occasion by the individual defendant. When the conduct and actions of an attorney over a period of years clearly show that his purpose and intention was to aid and guide a combination of persons engaged in crime, he becomes, in effect, a member of the criminal organization and forfeits his right to membership in an honorable profession.

We find the respondent guilty as charged. The motion to confirm the report of the referee should be denied, and the respondent disbarred.

O'MALLEY, TOWNLEY, GLENNON and UNTERMYER, JJ., concur.

Respondent disbarred.