110 N.J. Super. 489 (1970)
266 A.2d 154
ANTHONY J. GIULIANO, CALVIN D. WEST, MICHAEL, A. BONTEMPO, AND RALPH A. VILLANI, PLAINTIFFS,
v.
HARRY S. REICHENSTEIN, CITY CLERK OF THE CITY OF NEWARK, C. THEODORE PINCKNEY, RAMON ANESES, DONALD TUCKER, AND EARL HARRIS, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided May 25, 1970.
*491 Mr. Nicholas R. Amato attorney for plaintiffs.
Mr. Anthony J. Iuliani attorney for defendant Harry S. Reichenstein.
Mr. Morton Stavis for defendant C. Theodore Pinckney (Messrs. Stavis, Richardson, Koenigsberg & Rossmoore, attorneys).
Mr. Arnold K. Mytelka for defendants Ramon Aneses, Donald Tucker and Earl Harris (Messrs. Clapp & Eisenberg, attorneys).
ACKERMAN, J.S.C.
This matter is before the court on a complaint filed on May 21, 1970 by Anthony J. Giuliano, Calvin D. West, Michael A. Bontempo and Ralph A. Villani, who were candidates for councilman-at-large at the regular municipal election for the City of Newark held on May 12, 1970. Defendants are Harry S. Reichenstein, the city clerk of Newark, and Ramon Aneses, Earl Harris, C. Theodore Pinckney and Donald Tucker, who also were candidates for councilman-at-large in the May 12 election.
The basic issue for decision is whether the bracketing and designations of the candidates not eliminated in the May 12 election must remain exactly the same in the upcoming run-off election or whether there may be a new bracketing and change in designations. On May 20, 1970, one day before *492 the date fixed by the city clerk for the drawing of ballot positions for the run-off election to be held on June 16, 1970, the four plaintiffs filed a petition with the city clerk requesting that they be bracketed on the run-off ballot with a common designation, claiming the right to do so under N.J.S.A. 40:69A-155 and other pertinent statutes. The city clerk denied their petition and this suit was instituted. Upon application by plaintiffs, the court restrained the city clerk from drawing ballot positions and from the printing of ballots for the run-off election until Monday, May 25, 1970, the date fixed for hearing of the matter before the court. Such hearing has been held.

I
The facts are not in dispute. Pursuant to the Faulkner Act enacted in 1950 (N.J.S.A., Title 40, c. 69A, Arts. 1 through 17), Newark has adopted the "Mayor-Council Plan C" form of municipal government as provided for in Article 5 of the statute (N.J.S.A. 40:69A-55 through 60.4). See Horwitz v. Reichenstein, 15 N.J. 6 (1954); Trugman v. Reichenstein, 27 N.J. 280 (1958). Under this plan the city is governed by an elected mayor and an elected council consisting of four councilmen-at-large and five ward councilmen, all of whom serve four-year terms and are elected at "regular municipal elections." See N.J.S.A. 40:69A-58 and 59.
Article 5 of the statute, which contains the provisions specifically relating to "Mayor-Council Plan C" municipalities, incorporates other provisions of the Faulkner Act, common to all optional plans provided for therein, including the provisions of Article 17 thereof relating to elections (see N.J.S.A. 40:69A-150 through 162), and these are the statutory provisions directly involved here. As is apparent from the following summary of their provisions, most of these sections set forth details specifically relating to regular municipal elections held in May, including a specific provision as to bracketing and designations, and there is only one section *493 dealing with run-off elections, which is quite general in its terms. A question is presented as to the extent to which the provisions governing the regular election also apply to the run-off.
N.J.S.A. 40:69A-150 provides that "regular municipal elections shall be held in each municipality on the second Tuesday in May in the years in which municipal officers are to be elected," and N.J.S.A. 40:69A-151 provides that "the municipal election shall be held at the same place or places and conducted in the same manner, so far as possible, as the general election."[1]
N.J.S.A. 40:69A-153 provides that at least 46 days prior to a regular municipal election the names of candidates for all offices shall be filed with the municipal clerk and, together with N.J.S.A. 40:69A-154, sets forth in detail the manner in which candidates shall be nominated by petitions of voters. Nominations are made on an individual basis without any connection to bracketing of candidates or designations.
N.J.S.A. 40:69A-155 specifically permits bracketings and designations. It provides:
Any candidate whose name is to be printed on the ballot may petition the municipal clerk to print opposite his name on the ballot, a designation, in not more than six words, as named by him in such petition, for the purpose of indicating either an official act or policy to which he is pledged or committed, but the designation shall not indicate political party affiliations. On the filing of such petition the clerk shall cause the designation to be printed opposite the name of such candidate upon the ballot. If several candidates for the same office shall petition that their names be grouped together and that the one designation named by them shall be printed opposite their names, the clerk shall group their names in a bracket, and opposite the bracket shall print the same designation as aforesaid. Petitions requesting a designation or grouping of candidates shall be filed with the clerk on or before the last day fixed for filing the petition for nomination. If two candidates or groups select the same designation the clerk shall notify the candidate or group whose petition was last filed, and such candidate or group shall select a new designation.
*494 N.J.S.A. 40:69A-156, relating to the order of appearance of names on ballots and to the drawing of lots for ballot positions, provides:
The municipal clerk shall draw lots to determine the order in which the names of the candidates or groups of candidates shall appear upon the ballots. The names of the person or group of candidates first drawn shall occupy first place on the ballot, or voting machine, and the name of the person or group of candidates next drawn shall occupy second place, and so forth. The manner of drawing by lot shall be as follows: Paper cards with the name of each candidate or group of candidates written thereon shall be placed in a covered box with an aperture in the top large enough to allow the cards to be drawn therefrom. The municipal clerk in the presence of any candidate shall draw from the box each card without knowledge on his part as to which card he is drawing. The municipal clerk shall at least two days prior to the drawing notify each candidate by registered mail of the time and place of the drawing. The candidate or his representative shall have the right to examine the cards prior to their being placed in the covered box.
N.J.S.A. 40:69A-157, relating to publication of names of candidates in newspapers, provides:
Within 10 days after the expiration of the time for filing certificates, statement and petitions for candidates, and the drawing for position, the municipal clerk shall cause the names of the candidates as they are to appear upon the ballots to be published in proper form once in each of 2 newspapers having the largest circulation in such municipality, and published in this state, provided, however, if there is a newspaper of general circulation published in the municipality, 1 of the 2 notices should be published in such newspaper although it is not of the 2 in greatest circulation.
N.J.S.A. 40:69A-159 contains specific provisions as to the form and printing of ballots and as to the distribution thereof by the municipal clerk to election officials at polling places.
N.J.S.A. 40:69A-159.1, which was not a part of the original Faulkner Act and was first enacted in 1959, provides for the counting of ballots and canvass of returns and provides, among other things, that on the day following the election the municipal clerk shall canvass the returns from *495 election districts and the soldier and civilian absentee ballots and immediately file in his office and make public the result thereof.
N.J.S.A. 40:69A-160 provides, in general, that candidates must be elected by a majority of the votes cast and, in cases where more than one councilman-at-large is to be elected, specifically sets forth formulae to determine whether the required numbers of votes for election have been received by such candidates.
N.J.S.A. 40:69-A-161, which goes to the heart of this controversy, provides for a run-off election as follows:
In any regular municipal election referred to in section [40:69A-160] if a sufficient number of candidates do not receive a majority of the votes cast to elect the required number of councilmen at large, or no candidate for mayor or no candidate for ward councilman receives a majority of the votes cast for his respective office, a runoff election in the municipality or ward, as the case may be, shall be held on the fifth Tuesday next following such municipal election. The candidates for councilmen at large not elected at such municipal election, equal in number to twice the number of councilmen at large remaining to be elected, who received the greatest number of votes at such municipal election and the 2 candidates for mayor or for ward councilmen who received the greatest number of votes at such election, shall be the candidates for the office for which they were nominated, at such runoff election. Military service ballots shall forthwith be printed and distributed for the runoff election in the same manner, so far as possible, as for other municipal elections.
The candidate or candidates who receive the greatest number of votes at such runoff election shall be elected to the office or offices to be filled. If 2 or more candidates shall be equal and greatest in votes, for any of the purposes of this section, they shall draw lots to determine which one shall enter the runoff election or be elected therein, as the case may be.
If any candidate to be voted for at the runoff election dies 7 or more days prior to the runoff election, the candidate for said office not theretofore included in the runoff election but next in highest number of votes for that purpose, shall be substituted at such election in the place and stead of the deceased candidate and his name shall be substituted on the ballots for that of the deceased candidate.[2]

*496 II
At the regular municipal election held on May 12, 1970 there were seven candidates for mayor whose names appeared on the ballot. Six of the seven had designations printed under their names. No mayoral candidate received a majority of the votes cast. Kenneth A. Gibson, who occupied the fourth ballot position and whose designation was "Community Choice," received the largest number of votes for mayor. Hugh J. Addonizio, who occupied the first ballot position and whose designation was "For Peace and Progress," received the second largest number of votes. In accordance with N.J.S.A. 40:69A-160, they are the two candidates for mayor in the run-off election and their positions and designations on the run-off ballot are not directly involved here.
There were 29 candidates for the four offices of councilman-at-large whose names appeared on the ballots at the regular election. The four plaintiffs and the four candidate defendants were the eight candidates who received the largest number of votes, but none received a majority and they are the candidates for councilman-at-large in the run-off.
The four defendants, Messrs. Harris, Pinckney, Aneses and Tucker, in that order, occupied the first four positions[3] for the office of councilman-at-large on the ballots in the regular election and they were bracketed with a common designation "Community Choice," the same designation used in the regular election by Mr. Gibson. They were the only candidates for councilman-at-large who were bracketed. The four plaintiffs had positions and designations as follows. *497 Mr. West had the eighth ballot position and the designation "He Stood the Test." Mr. Villani occupied the eleventh ballot position and had no designation printed under his name. Mr. Bontempo occupied the twelfth ballot position and had the designation "Twelve Years  Performance  Not Promises." Mr. Giuliano occupied the twenty-first ballot position and had the designation "Progress in a Safer Newark." None of the 29 candidates for councilman-at-large in the May 12 election used the same designation as was used by Mr. Addonizio in that election.
As stated above, the four plaintiffs petitioned the city clerk on May 20, 1970 that they be bracketed on the run-off ballot with the common designation "For Peace and Progress," the same designation used by Mr. Addonizio in the regular election and presumably to be used by him in the run-off. Their petition was apparently filed after notice had been received by them from the city clerk in accordance with N.J.S.A. 40:69A-156 that a drawing for ballot positions on the run-off ballot would be held on May 21, 1970. The city clerk denied their petition, ruling in substance that the run-off election was simply a continuation of the May 12 election; that all designations and bracketings, or the absence thereof, were fixed and were to remain the same as they were on the ballots for the May 12 election, and that in the drawings for the eight ballot positions for councilman-at-large on the run-off ballots there should be five cards in accordance with N.J.S.A. 40:69A-156, with separate cards for each of the four plaintiffs and one card for the four bracketed candidate defendants. The plaintiffs contend that his ruling is a denial of their rights under the run-off statute and pray that an order be issued to permit their bracketing and the use of the common designation. In the alternative, they pray that if their right to bracketing and a common designation is denied, the four candidate defendants be denied the right to bracket and to a common designation on the run-off ballot.

*498 III
I am of the opinion that, under the proper construction of the statutes involved, plaintiffs are entitled to be bracketed and to the use of the common designation in the run-off election, and that the principal relief which they seek must therefore be granted. Their prayer that the candidate defendants be unbracketed is denied.
It is apparent that the language of the run-off statute itself does not clearly or expressly answer the problem presented here, and the few reported cases which deal with run-off elections under the Faulkner Act do not bear directly upon the point. See Trugman v. Reichenstein, supra; McCarthy v. Reichenstein, supra; see Seminara v. Smith, 89 N.J. Super. 349 (App. Div. 1965); Batistich v. Brennan, 88 N.J. Super. 84 (App. Div. 1965), aff'd 45 N.J. 533 (1965); Brick Tp. v. Spivak, 95 N.J. Super. 401 (App. Div. 1967), aff'd 49 N.J. 400 (1967).
It is axiomatic that election laws are to be liberally construed so as to effectuate their purposes. Wene v. Meyner, 13 N.J. 185, 197 (1953). And, as stated by the Supreme Court in the recent case of Roman v. Sharper, 53 N.J. 338, 341 (1969), dealing with the recall provisions of Article 17 of the Faulkner Act, "We should assume that the Legislature intended a reasonable approach, and we should construe the statute to provide one if we can." It is well settled that where the Legislature has not given directions to municipal clerks or county clerks in statutory enactments relating to elections, either in specific terms or in language from which the legislative intent can be discerned, as to matters pertaining to the conduct thereof, some decisions must rest within the discretion of such clerks. See Hawkes v. Gates, 129 N.J.L. 5, 11 (Sup. Ct. 1942). But, it is also clear, even in such cases, that if the course taken by the clerk in exercising his discretion is not rooted in reason, the bounds of his delegated authority have been exceeded and it is the duty of the court to say so. *499 Richardson v. Caputo, 46 N.J. 3, 9 (1965). And, if a legislative enactment by its express terms or by a fair construction thereof charts a procedure prescribed by the Legislature for the clerk to follow, he does not have discretion in the matter. Axtell v. Caputo, 85 N.J. Super. 80 (App. Div. 1964). This case is of the latter type and I am of the opinion that the decision of the city clerk denying the right to plaintiffs to bracket and use a common designation in the run-off election cannot be sustained as a permissible exercise of his discretion in a delegated matter.
Here, as is apparent from the election provisions of Article 17 of the Faulkner Act referred to above, the only section of the act which expressly deals with run-off elections is N.J.S.A. 40:69A-161. It is general in its terms and does not expressly deal with certain matters which are presented in the conduct of every such election. Unlike the prior sections of the article which deal with the regular municipal election to be held on the second Tuesday in May, it makes no specific reference to bracketing or designations, to ballot positions or the drawing of lots therefor, to publication in newspapers of names of candidates as they will appear on the run-off ballots, nor to the exact form of run-off ballots and the general printing and distribution thereof. However, unlike the prior sections relating to the regular May election, which prior to 1959 made no mention in any way to military ballots, there is a specific provision in the run-off statute which was in the statute as originally enacted and which provides that military ballots shall be printed and distributed "in the same manner, so far as possible, as for other municipal elections." This provision, as well as the scheme of the election provisions of the Faulkner Act as a whole and the reasons therefor, as well as those of the general election laws, incorporated in the Faulkner Act by N.J.S.A. 40:69A-151 "so far as possible," clearly indicate that the Legislature intended that the run-off statute should not be construed in a vacuum, and that the provisions relating to regular municipal elections *500 should apply to run-off elections "in the same manner so far as possible."
In Seminara v. Smith, 89 N.J. Super. 349 (App. Div. 1965), the court said:
* * * the Faulkner Act as a whole was adopted as essentially one, integral comprehensive plan for local government. Its different cognate provisions, adopted at one time, lend significance to each other. * * * [at 354]
See also Pritel v. Burris, 94 N.J. Super. 485, 490, 492 (App. Div. 1967).
And in Horwitz v. Reichenstein, 15 N.J. 6 (1954) Chief Justice Vanderbilt, writing for the court, stated with respect to another matter relating to elections arising under the Faulkner Act:
At the most, all that can be said for the appellant's contention is that the language of the quoted section of the Faulkner Act is ambiguous. If so, it is our clear duty to choose that construction which will carry out the legislative intent of the statute as a whole * * *

* * * * * * * *
The Faulkner Act, moreover, does not purport to stand alone, despite the appellant's contention to the contrary. Thus it provides that "the municipal election shall be * * * conducted in the same manner, so far as possible, as the general election." N.J.S.A. 40:69A-151.

* * * * * * * *
Nor are these the only instances of the dependence of the Faulkner Act on the general election laws. The Faulkner Act makes no provision for soldier voting except in run-off elections and no provisions at all for absentee voting as the general election laws do, N.J.S.A. 19:57-1 et seq. It would be unthinkable to exclude soldiers and absentees from all elections held under the Faulkner Act, except soldiers in run-off elections, when they are permitted to vote in every other kind of election. Without continuing to demonstrate further the instances in which the Faulkner Act necessarily depends upon the general election laws, we cannot agree with the appellant's contention that the Faulkner Act must be construed as an entirely independent legislative scheme separate and apart in every respect from the general election laws. [at 8-10]
It is, therefore, perfectly clear, applying the above precedents, that the run-off statute must be construed in *501 harmony with the other provisions of the Faulkner Act relating to regular elections and that those provisions must be held applicable to run-off elections "so far as possible." In the opinion of the court, this applies to all such provisions which may be applied to run-off elections, including the drawing for ballot positions and the provisions relating to bracketing and designations.
Thus, for example, one might argue that the run-off statute is silent as to ballot positions and that the city clerk might reasonably decide in his discretion that (1) ballot positions should be fixed on the run-off ballots in accordance with the relative positions of candidates drawn for positions on the ballots at the regular election, or (2) ballot positions should be awarded in accordance with the number of votes received by candidates at the regular election, with those receiving the greatest number of votes receiving the first positions, or (3) the ballots should remain exactly as they were at the time of the regular election with the unsuccessful candidates simply deleted or "red penciled" from the ballot and with the candidates in the run-off appearing on the ballot in exactly the same manner and in the same positions as they appeared in the ballot for the regular elections. The city clerk has, however, properly applied the provisions of N.J.S.A. 40:69A-156 "so far as possible" to the run-off election and has held that there must be a new drawing as provided in that statute.
In the court's opinion, the city clerk must similarly apply the provisions of N.J.S.A. 40:69A-155 "so far as possible" with respect to bracketing and designations.
It was for the Legislature to determine whether bracketing and designations would be permitted in municipal elections under optional plans for government of the type here involved, which call for nonpartisan as distinguished from partisan elections under the general election laws. Such elections are nonpartisan only in the technical sense that political parties, as such, are not involved and the primary system is not used. See Batistich v. Brennan, supra. The Legislature *502 followed the recommendation of the Faulkner Commission that bracketing and designations not be permitted in the election of charter commissioners to study and recommend to voters of municipalities what optional method of municipal government should be adopted. See Dios v. Ronnie, 76 N.J. Super. 390 (App. Div. 1962); Final Report of the Commission on Municipal Government (February 1949), at 31-32. However, although the original drafts of the election provisions of the act as proposed by the commission in its first report dated November 1, 1948, contained in Preliminary Statement of the Commission on Municipal Government, at 63-64 (see § 6-5), and in its Final Report, at 94-95 (see § 8-5), issued under date of February 14, 1949, contained no provision permitting bracketing and designations in municipal elections for elective officers, the statute as finally proposed by the Commission in the Second Report of the Commission on Municipal Government (February 1950), at 54-55 (see §§ 17-6 and 17-7) contained the provision permitting bracketing and designations in such elections, and that provision was adopted by the Legislature when the Faulkner Act was passed in 1950. N.J.S.A. 40:69A-155 and 156; Dios v. Ronnie, supra. Bracketing is also permitted in general elections. See N.J.S.A. 19:14-10, 19:14-12; 19:49-2. Although bracketings and designations admittedly may be of partisan advantage or disadvantage to candidates, they do group "certain of the candidates on the ballot under a mark or symbol which distinguishes them from other candidates," Dios v. Ronnie, supra, 76 N.J. Super. at 394, and they do serve to convey information to the voter which helps him in exercising his franchise in the voting booth. See Richardson v. Caputo, infra; Harrison v. Jones, 44 N.J. Super. 456 (App. Div. 1957); Ehrhardt v. Bergen, 69 N.J. Super. 390 (App. Div. 1961).
The clerk has taken the view that since the run-off is a "continuation" or "completion" of the regular election, all bracketings and designations must remain frozen as they were in the regular election. It is the court's view that this *503 interpretation of the bracketing statute is unwarranted and not in accordance with the purpose of the municipal election statutes as a whole, nor is it an application of the statute to run-offs in the same manner as in regular municipal elections "so far as possible." It is true, of course, that, in a sense, the run-off is simply a completion of the regular election. But it is also a new election, particularly in a case such as this where no candidate for office received a vote of the majority in the regular election and the number of candidates was large. See Brick Tp. v. Spivak, supra. The field of candidates has been narrowed and the entire electorate goes to the polls again to select candidates who will be approved and selected by a majority of the voters who exercise their right to vote. A fundamental tenet of the Faulkner Act is that elected municipal officers shall be selected by a majority vote. See Trugman v. Reichenstein, Seminara v. Smith and Brick Tp. v. Spivak, supra. The new election requires that if voters who voted at the regular election for eliminated candidates are to exercise their franchise, they must switch their allegiance and express new choices. Where no candidate has received a majority in the regular election, it serves only as an elimination contest, somewhat like a primary, and the run-off is a new election in much the same sense that a general election is a new election separate and distinct from a primary election.
Bracketings and groupings of candidates, permitted by the Legislature, do convey information to the electorate as to the policies and affiliations of candidates. As stated above, in a run-off the field is narrowed and the candidates start from scratch. Circumstances have changed and it is almost inevitable, particularly where the original field was large, that, at least to some extent, old alliances and preferences, among candidates as well as the voters, will have been thwarted by eliminations and that new alignments will be made or crystallized. In the regular election candidates for multiple offices may bracket and use common designations simply by filing timely petitions therefor, regardless of the *504 consent or wishes of opposing candidates. The statute provides that the municipal clerk "shall" grant such petitions and he has no discretion in the matter. To require bracketings and designations to remain frozen in all instances in a run-off would not only present complications where bracketings are split because some bracketed candidates have been unsuccessful, but might also render such bracketings and designations, or the lack thereof, sterile in view of changed adversaries and alignments. If the status quo were perpetuated, information might be withheld from the electorate rather than given to it. In the court's view, the application of N.J.S.A. 40:69A-155 and the related provisions of N.J.S.A. 40:69A-156 to run-off elections "in the same manner, so far as possible, as for other municipal elections" requires that timely applications for new bracketings and designations be permitted in the run-off.
This interpretation is clearly justified and supported by the recent decision of the Supreme Court in Richardson v. Caputo, 46 N.J. 3 (1965). There the court, in holding that a county clerk exceeded the bounds of his delegated authority in the positioning on the ballot of multiple candidates of a party which had not attained the technical status of a "political party" within the meaning of the election laws, held that a prime object of election laws is to enable the voters to identify and find the candidates in order to intelligently exercise their franchise. Chief Justice Weintraub, writing for the court, said, among other things, that the county clerk should accord affiliated candidates a line exclusively their own,
* * * if that course is feasible and if in the context of the whole ballot it would afford all the voters a clearer opportunity to find the candidates of their choice. [at 8]
He also said:
The purpose of the ballot is to permit voters to record their will, and one must assume the Legislature intended a ballot so arranged *505 that all voters may find their candidates with the least difficulty the total content of the ballot will permit. Here we can find no reason, and no one suggests a reason, to deny plaintiffs, the benefit of their joint candidacy or to deny a voter who wants to advance the party or the principles of the candidates an easy opportunity to find all of them. [at 9]
With respect to the harmonious construction of statutes there involved relating to voting machine ballots and paper ballots, he said that they should be construed:
* * * to the end that although the provisions for drawing do apply, the result of the drawing shall be portrayed upon the voting machine ballot in a way which will achieve the basic aim of assisting the voter to register his choice. [at 13]
He concluded:
We of course cannot anticipate and suggest guidelines for all situations. Nor should it be necessary. There is guidance in the polestar  a ballot which will permit all the voters to express their will fully and as easily as circumstances will reasonably permit. [at 14]
See also Farrington v. Falcey, 96 N.J. Super. 409 (App. Div. 1967); Harrison v. Jones, supra.
It is, of course, clear that the provisions of the statute cannot be literally complied with since requests for changes in bracketings or designations or for new bracketings and designations can be made only after the results of the inconclusive regular election are made known and candidates have a reasonable opportunity to act. Here, according to an affidavit filed by the city clerk, there was a recount, and the plaintiffs' application was made in advance of the date fixed for the drawing for ballot positions. In the circumstances, their application was timely and in compliance with the terms of the statute so far as possible. See Pritel v. Burris and Harrison v. Jones, supra.
An order will be entered directing the city clerk to grant the plaintiffs' petition for bracketing and the use of the *506 common designations, and further directing him to conduct any drawing for ballot positions in accordance with such bracketing. By the same token, if the candidate defendants desire a change in bracketing, such as a change in the order of their names as they appeared in their grouping in the bracket and on the ballot for the regular election, they are entitled to such change upon application to the city clerk therefor. No costs.
NOTES
[1] Emphasis in quotations supplied by the court unless otherwise noted.
[2] The last paragraph of the statute was not a part thereof as originally enacted and was added by L. 1960, c. 86, apparently as a result of the decision in McCarthy v. Reichenstein, 50 N.J. Super. 501 (App. Div. 1958).
[3] The candidates for mayor appeared on Line A of the ballots, and the candidates for councilman-at-large appeared on Line B, and the candidates for ward councilman appeared on Line C. The lines and balloting positions were staggered horizontally with the mayoral candidates occupying positions A-1 through A-7, and the candidates for councilman-at-large occupying positions B-9 through B-37, and the candidates for ward councilman occupying positions commencing with C-39.