MARY MOCHARY, MICHAEL FRANCIS, BARBARA THOMAS AND DAVID WILDSTEIN, PLAINTIFFS-APPELLANTS, v. NICHOLAS CAPUTO, AS ESSEX COUNTY CLERK, DEFENDANT-RESPONDENT, AND RAYMOND DURKIN, DEFENDANT.

Argued April 23, 1985—Decided July 22, 1985.

*Mahlon L. Fast* argued the cause for appellants (*Fast & Fast*, attorneys).

*Jessica G. de Koninck*, Assistant County Counsel, argued the cause for respondent (*David H. Ben-Asher*, Essex County Counsel, attorney).

PER CURIAM.

The issue in this appeal concerns the manner in which voters should be assured of absolute fairness in the choice of ballot positions for candidates of political parties. The controversy is moot because a general election involving the candidates has already occurred. Nonetheless we believe that the issues are

recurrent and warrant our consideration. *See McGlynn v. New Jersey Public Broadcasting Authority,* 88 *N.J.* 112 (1981). We therefore granted plaintiffs' petition for certification. 99 *N.J.* 174 (1984).

The appeal concerns the drawing for ballot positions for the 1984 general election in Essex County. Plaintiff Mary Mochary was the Republican Party candidate for the United States Senate for the State of New Jersey. Plaintiffs, Barbara Thomas and David Wildstein were, respectively, vice-chair of the Essex County Republican Party and the campaign manager for Republican candidates in the county. They attended the drawing for ballot position at the Essex County Clerk's office on August 13, 1984.

According to their contentions, the drawing was conducted in a room that had a counter running its length. The counter was approximately four feet high. Above it was a glass partition. The plaintiffs, Wildstein and Thomas, were on the public side of the counter and on the Clerk's side were several desks. A reporter and various other public employees were also in the room on the public side of the counter. The Clerk read a prepared statement describing the procedure and the names and offices to be drawn. He then demonstrated the materials to be used in the draw. These materials consisted of plastic capsules that were located in an ashtray and the papers with the names of the respective political parties that were to be inserted into the capsules. Prior to the drawing, he slid an ashtray containing several open capsules through an opening in the glass partition, cautioning the witnesses not to touch the capsules; he permitted the plaintiff Barbara Thomas to look inside the juror selection box that was employed to contain the capsules; and he also showed the witnesses the paper strips upon which Wildstein was able to read the typewritten words designating each party. Plaintiffs contend that the Clerk then put the box, the papers, and the capsules on a desk behind him. At the desk, he folded the papers and inserted them into the capsules that he selected. Plaintiffs assert that as a result of

the way in which the Clerk turned his body and the distance between them, they were unable to see close-up and in detail what had been done. The capsules are about three-quarters of an inch in length and are approximately the size of a cold-remedy capsule.

Still standing at the desk behind the counter, the Clerk inserted the capsules into the box, shook the box, and then put his hand into the box and took out one capsule at a time. He opened the first capsule and said "Democrat" and then took out the second and said "Republican".

According to plaintiffs, this result had occurred on 40 out of the last 41 times that the draw in Essex County had been made. They sued to set aside the draw. Although the statistical odds of such an occurrence are calculable, neither side offered proof of the odds. At oral argument before us, the Court suggested, and thereafter plaintiffs concurred, that the odds were less than one in 50 billion. Defendant disputes the basis for the statistics (but not the certainty of the calculation), preferring to consider only the period from 1968 to 1984 and excluding three years when deputies made the draw. (Prior to the 1968 amendment, "paper cards, of the same size, substance and thickness * * * " were drawn from the box.) During this shorter period, defendant drew 14 Democratic slips first in 14 attempts. Defendant's expert does not essay a numerical statistic, reporting only that the odds for such consistency are "much lower" than "not negligible." Although the record is not clear as to defendant's exact role in the twenty-four years of his tenure, defendant's expert does not in any way contradict plaintiff's position on the statistical odds of drawing one party first forty out of forty-one times, as the defendant had stated in a deposition that was introduced at the trial below.

Suffice it to say that most would feel, as the trial court did, that the evidence "screams for some conclusion on an emotional basis" that more than coincidence is involved. It is not emotion at all, however. Confronted with these odds, few persons of

reason will accept the explanation of blind chance. Given these circumstances, even a limited judicial role in election matters should not tolerate any further loss of public confidence in the integrity of the electoral process by allowing such "coincidence" to continue without a judicial effort at resolution.

*N.J.S.A.* 19:14–12 controls the procedure that is to be followed when drawing for positions on the ballot:

> The manner of drawing the lots shall be as follows: paper slips with the names of each political party written thereon, shall be placed in capsules of the same size, shape, color and substance and then placed in a covered box with an aperture in the top large enough to admit a man's hand and to allow the capsules to be drawn therefrom. The box shall be well shaken and turned over to thoroughly intermingle the capsules. The county clerk or his deputy shall at his office, draw from the box each capsule separately without knowledge on his part as to which capsule he is drawing.
>
> The person making the drawing shall open the capsule and shall make public announcement at the drawing of each name, the order in which name is drawn and the office for which the drawing is made.
>
> \*     \*     \*     \*     \*     \*     \*     \*
>
> Any legal voter of the county or municipality, as the case may be, shall have the privilege of witnessing the drawing.
>
> \*     \*     \*     \*     \*     \*     \*     \*

We are satisfied that in the context of this case the trial court correctly held that since the electoral draw had occurred, and the court had not had the opportunity to resolve the dispute before the drawing, the court's reviewing role was restrained. If these issues had arisen in a way that would have permitted the court to fashion a timely remedy, the result of this suit would undoubtedly have been different. In these circumstances, however, the court concluded that there had been substantial facial compliance with the procedure described in the statute and found no evidence that there had been frustration of the underlying and overriding objectives of the Legislature in setting forth the procedure to be used in conducting the drawing. The court found that the Clerk did follow, as far as the evidence disclosed, exactly the procedure set forth in the statute in question, having put the names of the parties on paper slips; inserted the slips in capsules of the same size, shape,

color, and substance; placed them in a suitable box; and literally allowed the choice to be witnessed. It concluded that in the totality of the circumstances the course followed by the Clerk was reasonable, and that since there was no evidence of fraud, it declined to set aside the draw. In an unreported decision, the Appellate Division affirmed substantially for the reasons expressed by the trial court. We do not agree that there was full compliance, but do agree that it was too late to remedy the situation and certainly agree that the draw could not be set aside.

On the other hand, there must be an abdication of an appropriate judicial role in vindicating the voter's right to witness such a draw effectively. The right to participate equally in the electoral process is the bedrock of our system. It is "of the essence of a democratic society." *Reynolds v. Sims*, 377 *U.S.* 533, 555, 84 *S.Ct.* 1362, 1378, 12 *L.Ed.*2d 506, 523 (1964). It is the right upon which all other civil rights depend. As mundane as it may seem, the statutory right to draw a certain position on the ballot "is a substantial one and should be protected by the court[s] whenever it is prejudiced or impaired." *Cooke v. Lomenzo*, 31 *N.Y.*2d 244, 250–251, 336 *N.Y.S.*2d 457, 462, 288 *N.E.*2d 291, 294 (1972) (Jasen, J., dissenting).

The Legislature has assigned to courts an integral role in maintaining the electoral process. *N.J.S.A.* 19:13–12 (review of petition of nomination); *N.J.S.A.* 19:14–20 (correction of ballot); *N.J.S.A.* 19:28–1 (recount of votes); *N.J.S.A.* 19:29–2 (contest of election); *N.J.S.A.* 19:32–18 (emergency orders allowing vote); *N.J.S.A.* 19:33–1 (striking names from register); *N.J.S.A.* 19:57–24 (disputes over absentee ballots). On numerous occasions courts have intervened to enforce compliance with various provisions of our election laws. *See Gormley v. Lan*, 88 *N.J.* 26 (1981); *Richardson v. Caputo*, 46 *N.J.* 3 (1965); *Dimon v. Ehrlich*, 97 *N.J.Super.* 83 (App.Div.1967); *Axtell v. Caputo*, 85 *N.J.Super.* 80 (App.Div.1964); *Perry v. Giuliano*, 46 *N.J.Super.* 550 (App.Div.1957); *Giuliano v. Reichenstein*, 110 *N.J.Super.* 489 (Law Div.1970).

■ In this case defendant maintains that it is within his discretion to refuse to permit witnesses to sample the capsules or watch closely as he inserts the strips of paper in them. He points to previous experience with paper ballots in which such participation may lead to indentation of the papers. Concededly in these matters a wide range of discretion is reposed in the election official. But that discretion is not without bounds. "Discretion, of course, is never the plaything of office. Rather it imports responsibility, a duty to act with reason." *Richardson v. Caputo, supra,* 46 *N.J.* at 9. It is not responsible and reasonable, after numerical "coincidence" has reached the proportions of this case, that election officials not take affirmative steps to strengthen confidence in the integrity of the electoral process.

We are informed that the County Clerk has already undertaken to replace the tiny capsules that were employed in this contest with a more substantial and more perceptible version. We are certain that, in addition to that desired change, other steps can be taken to strengthen voter confidence, including the following: that the Clerk allow the unassembled capsules to be on view for a reasonable time before the draw; that the entire drawing procedure be conducted without a barrier of any sort separating the Clerk and the witnesses (excepting, of course, the desk or table on *top* of which the drawing paraphernalia are placed); that the Clerk conduct the entire drawing procedure at a distance close enough to witnesses to permit unimpeded observation of the drawing process; that the Clerk initially display the individual unassembled capsule pieces and immediately thereafter assemble the capsules in clear view of the witnesses; that the Clerk display the legend actually withdrawn from the "winning" capsule as well as the legend thereafter withdrawn from the "losing" capsule; and that the Clerk conduct all of the foregoing procedures at "full face" to the witnesses, not at profile or with his back turned to the witnesses.

The parties should resolve these matters before the draw, since courts ordinarily cannot, as a practical matter, effectively intervene thereafter. One way of resolution would be by a written understanding covering details of the process, sufficient to assure the integrity of the draw in both appearance and fact; another would be by the use of a non-partisan monitor, and in general permitting procedures likely to assure the integrity of an impartial draw—subject only to the laws of chance. Given extraordinary statistical circumstances such as are present here, it is a proper role for a court to adjudicate controversies between parties as to the means of maintaining the fairness of the electoral process. We do not doubt a court's power in special circumstances to mandate remedial measures as the concurrence would. We believe the better course is to expect that the reasoned discretion of the Clerk will reach the same conclusion.

Election officials share the same goals as the parties, to guarantee full and fair participation in the electoral process. Other institutions, public and private, conduct public drawings that enjoy unquestioned confidence. Within the framework of the statute no less can be accomplished here.

We are therefore confident that election officials will exercise their discretion with "responsibility * * * [and] with reason," *Richardson v. Caputo, supra,* 46 *N.J.* at 9, to insure that no questions may linger, and that each political party's fair chance to a statutory ballot position not be diminished or diluted.

The judgment of the Appellate Division is affirmed.

CLIFFORD, J., concurring in judgment.

This is a touchy case. The circumstances disclosed by this record must shock even the most cynical observer of the public scene. But the delicacy of the subject—a public election matter and the courts' legitimate function in respect thereof—should not cause us to mute our voice. I presume to write because I fear the Court's message is muffled and its "resolution" of the

dispute creates unwarranted risks. The response to the situation should be a clarion call for reform rather than a tranquilizing message of appeasement delivered in dulcet tones.

I concur in the judgment because the Court reaches the right result: it concludes that under the circumstances the trial court properly denied a redrawing for ballot positions. I part company with the majority, however, because of its reluctance to interpret the pertinent statute, *N.J.S.A.* 19:14–12, so as to impose on election officials certain minimum requirements for fair procedures in ballot-position drawings. Especially do I disagree with the invitation to parties in a contested election to resolve those procedures for themselves. In that respect the Court's opinion runs counter to the existing statutory framework in this area and tends to cloud, rather than clear, the issue of the County Clerk's responsibilities in conducting such drawings. By taking that approach the Court ignores its obligation to define what is involved in "witnessing" the drawing as contemplated by *N.J.S.A.* 19:14–12, and foregoes an opportunity to further the intent of the legislature by imposing minimum safeguards that would materially improve the procedures for those drawings.

I

Plaintiffs, all Republicans, are former candidates for statewide, county, and municipal offices, along with the Republican county chairman. Defendants are Nicholas Caputo, a registered Democrat who has served as Essex County Clerk for twenty-four years, and Raymond Durkin, Democratic county chairman, who did not appear in the action.

The dispute centers around the August 13, 1984 drawing by Mr. Caputo for various positions on the ballot for the upcoming November election. The political party that "wins" the drawing is placed on "line A" on the November ballot. Those "in the know"—even those who know precious little about these things—agree that the conventional wisdom indeed has it accu-

rately: line A represents the preferred ballot position. And as fate, or whatever, would have it, at the August Thirteenth drawing, line A went to the Democratic party, the fortieth time that this same phenomenon had emerged in forty-one drawings during Mr. Caputo's tenure as County Clerk.

Under the pertinent statute, *N.J.S.A.* 19:14–12, "[a]ny legal voter of the county or municipality * * * shall have the privilege of witnessing the drawing." Plaintiffs Thomas and Wildstein were in the group that attended the drawing, and neither they nor any other member of the group raised any question or otherwise complained about the manner in which the proceedings were conducted, as set forth in detail in the Court's opinion, *ante* at 121–122. Plaintiffs now contend, however, that they are entitled to a redrawing because there was not compliance with the statutory provision for "witnessing the drawing." Specifically they contend that "witnessing" should include all sensory perceptions—particularly touching—that might be helpful in confirming the legitimacy of the ballot-position drawing.

## II

The statute in question, *N.J.S.A.* 19:14–12, provides a detailed set of procedures to be followed in a drawing for ballot positions. *Ante* at 122–123. Once the specific requirements of the statute have been met, the County Clerk is vested with a degree of discretion in the conduct of the drawing. Put differently, discretion does not come into play until all the mandates of the statute have been met. *See Quaremba v. Allan,* 67 *N.J.* 1, 8 (1975).

Although it reaches the unadorned conclusion that in this case there was not full compliance with the statute, *ante* at 124, the Court leaves us in suspense by not providing any specific example of non-compliance or infractions. This adds little to anyone's understanding of the case. It does, however, reinforce the idea that a Clerk may violate the statute and do so

with impunity. The fact of the matter is that the most meticulous review of this slim record will uncover no act of nonconformity, because on the face of things Caputo complied with the express statutory directives *as they apparently have been understood to date.* Moreover, there has been no demonstration of fraud.

But despite the County Clerk's apparent compliance with the statute in this instance, one cannot help being struck by the marvel, the otherworldly coincidence, of one party "winning" the drawing forty out of forty-one times. That the record supports this numerical result is not open to question. Nor is it open to any doubt whatsoever that assuming a fair and random selection of one item out of a possibility of two, the odds on drawing line A forty times out of forty-one draws are about one in fifty billion. Get that? ONE in FIFTY BILLION!

It understates the case to suggest that this extraordinary state of affairs should act as a challenge to anyone and everyone concerned with the preservation of voter confidence. The finger does not point at Mr. Caputo, who did not conduct all of the forty-one drawings himself—it points at the system. And a system that produces the results recited above has to excite some skepticism about whether it is on the "up-and-up." That kind of skepticism is a symptom of a diseased system, one that should no longer be tolerated.

### III

If such a system is not to be suffered henceforth, corrective measures must be imposed. This is not to say, however, that they must or should be imposed on the parties to this litigation, inasmuch as the case started with a ballot drawing conducted almost one year ago, followed by a general election and the subsequent seating of various public officials who have served their respective constituencies for about half a year. We cannot unscramble that egg. Moreover, we should be mindful of the fact that until this case no court has been called upon to

interpret the word "witnessing" as used in *N.J.S.A.* 19:14–12. For that reason, as well as because of the apparent acquiescence of plaintiffs at the time of the drawing, it would be unfair—to say nothing of impolitic and unrealistic—to let any "new" meaning affect the result in this case. *Cf. State v. Galati,* 64 *N.J.* 572 (1974) ("This Court on occasion, for the sake of essential fairness, has foreborne or modified action it would otherwise take, or intends to take in the future * * *. These have included instances * * * 'where the Court had no reported opinion touching the immediate subject * * *.' " *Id.* at 578, quoting *In re Abrams,* 56 *N.J.* 271, 278 (1978)).

What, then, should be done for the future? I would commence with the proposition that the legislative purpose underlying the "witnessing" requirement of *N.J.S.A.* 19:14–12 is to maintain public confidence in the election process by ensuring that a fair and impartial drawing is held. To ensure that confidence I would pour some content into "witnessing." Whatever else the statutory privilege of "witnessing" may imply, it surely must include a reasonable opportunity to observe—to see, to watch—the drawing. Accordingly, I would hold that henceforth, for a "witnessing" to meet the bare minimum requirement of the statute, it should include, in addition to the replacing of the tiny capsules used in this contest with a more substantial and perceptible version, all of the specific steps listed by the Court, *ante* at 125. My difference with my colleagues is that whereas they view those measures as desirable—"steps [that] can be taken to strengthen voter confidence," *id.*—I would declare them to be indispensable ingredients of a fair drawing. I would mandate them, as part of the statutory right of witnessing.

As for plaintiffs' contention that the privilege of witnessing should include the right to inspect the capsules by touching them, it is unclear whether the ordinary and well-understood meaning of the word "witness" includes the sensory perception of touch. As observed by the trial court, allowing people other than the Clerk to touch the capsules could very well create as

much apprehension as it would alleviate. It is arguable that allowing others to touch the capsules transforms witnesses into participants. Moreover, *N.J.S.A.* 19:14–12 provides that *"[a]ny* legal voter * * * shall have the privilege of witnessing the drawing" (emphasis added), so that requiring the opportunity to touch as an essential statutory element of witnessing could produce an awkward, even chaotic, situation as the number of witnesses increases. Accordingly, it seems to me that *requiring* the opportunity to touch as a component of the privilege to witness would be a substantial change in the method of selection that should come from the legislature rather than from this Court.

Nonetheless, although the statutory privilege of witnessing does not *compel* an opportunity to touch the paraphernalia, it does not follow that the statute *prevents* the Clerk from allowing certain representatives to touch the capsules. Here we reach the area of the Clerk's discretion. I would encourage the practice of touching when, in the reasonable exercise of his discretion, the official conducting the drawing perceives that no practical difficulties will result. In addition, it may be that the legislature's curiosity will be piqued by the startling history of ballot position drawings in Essex County. That body might wish to consider the advisability of amending *N.J.S.A.* 19:14–12 to build in a safeguard that would allow one representative from each political party to inspect the drawing paraphernalia by touching the capsules.

## IV

In my view the foregoing amount to straightforward and concrete improvements. My colleagues likewise recognize most of them as such, as the Court's excellent list of available steps, *ante* at 125 demonstrates; but instead of imposing them or some other requirements as a matter of statutory interpretation, the Court is content to assume an avuncular role, offering precatory phrases in the place of mandates. My fear is that

because the Court does not offer a concrete remedy to future plaintiffs nor provide guidance to lower court judges who may have to address these same or similar problems in forthcoming elections, the majority opinion may actually encourage future abuses by conveying the image that the Court is powerless to act in this area. I can readily accept the notion that members of this Court may very well disagree as to what steps are necessary to do justice to the legislature's purpose in providing that a privilege shall exist to witness the ballot position drawing; but there should be no difference of opinion that the responsibility of giving meaning to the statute lies with this Court, not with some future set of litigants.

That is where the real rub lies. The Court would have the "parties"—a group left undefined in the majority opinion—resolve these matters on their own at some unspecified time before the drawing. That approach is little short of abandonment of our responsibility to define the statutory term "witnessing." By setting out a detailed procedure to be followed in conducting the ballot-position drawing, *N.J.S.A.* 19:14–12 undoubtedly contemplates a certain uniformity in the process to be followed. To the extent practicable this Court should continue the legislature's call for consistent standards by defining the statutory privilege to witness the drawing. Providing minimum required procedures furthers this objective. Simply making suggestions—no matter how sensible, as the ones floated by the Court surely are—does not. And delegating those important decisions to the parties does not. Moreover, the Court's approach intimates that the privilege of witnessing is available only on the demand of those citizens who are in a position to negotiate for it. The process of ensuring that which every citizen has come to expect as a matter of fundamental right—a fair election, and one that *appears* to be fair—has now become a product of the marketplace.

By not determining what standards are required by the statute, the Court has all but guaranteed future litigation on

this identical issue. Aside from a number of nonbinding suggestions, the Court has provided no guidance at all to those who will need to know what the statute demands. The parties are left on their own to fill the gaps in the statutory directions—an invitation to confusion. A likely scenario is that future parties, unable to agree, will turn to the courts for the statutory interpretation that should be, but regrettably is not, a part of today's opinion. In short, we will be back to square one.

### IV

The importance of this case should not be overlooked. It is not extravagant to say that the problem confronting us goes to the heart of the democratic system. Failure to address it head-on can only foster disrespect for processes of free elections. The random drawing of ballot positions is a major safeguard against election fraud, and "[n]othing is as dangerous in a democracy as a safeguard which appears to be adequate but is really a facade." A. Vanderbilt, *The Challenge of Law Reform* (1955), quoting E. Wilkerson, M.P., in *Committee on Members' Powers Report* at 138 (1936).

Sir Winston Churchill reminded us that "[a]t the bottom of all the tributes paid to democracy is the little man, walking into the little booth * * *." F. Czarnoski, *The Wisdom of Winston Churchill* at 99 (1956). Only if the little man walks with confidence in and respect for the system can the promise implicit in the precious right to cast his ballot be fully realized.

CLIFFORD, J., concurring in result.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and GARIBALDI—6.

*For reversal*—None.