# IN THE MATTER OF NORMAN J. ABRAMS, AN ATTORNEY AT LAW.

Argued February 17, 1970—Decided June 22, 1970.

*Mr. Hugo M. Pfaltz, Jr.,* for the order.

*Mr. Gerald A. Flanzbaum* argued the cause for respondent.

The opinion of the court was delivered by

WEINTRAUB, C. J. This disciplinary proceeding was prompted by a news account of a plea for leniency made by respondent on behalf of his client, Richard Young, who had pled guilty to a lottery charge.

The transcript of the sentencing proceeding reveals the following statements by respondent:

I say to you very openly, sir, I have not appeared in this county before your Honor, ever, to my knowledge, representing anyone involved in lottery. I have appeared over the last 25 years in more cases than I can remember involving lottery in Union County. Richard Young is definitely a little bit higher than a writer. There is no misleading, and I think we made this very clear to Lieutenant Donatelli.

THE COURT: I was convinced of that before I heard the motion to suppress.

MR. ABRAMS: There is no question, sir. I might add as an aside, sir, not to mitigate or justify an illegal operation as a statute that has been violated, but he was not the object of the pursuit. One higher than he, whose name he gave to Lieutenant Donatelli in my presence —

THE COURT: What was the name?

MR. ABRAMS: Sam Pickett. Your Honor, I feel this is —

THE COURT: Donatelli places Pickett a step below and not a step above.

MR. ABRAMS: I represent to your Honor, sir, from my knowledge of the Union County operation, and I do not apologize for representing lottery people. They are entitled to representation and they pay well. I say this to you very openly. This does not make me become a prostitute to their situation.

This man, who is now on their red list because he has been caught, he will have a record whether it be incarceration, fine, whatever it may be. He is no longer of any use to them. I represent to your Honor that the name Sam Pickett given to him, to Lieutenant Donatelli by this man is a higher echelon. * * *.

\*        \*        \*        \*        \*        \*        \*        \*

I feel, sir, that if he is taken from the family unit, that what will happen to this family is more severe than what will happen to society if he is punished in dollars, because these dollars today are not going to be paid by the syndicate, the mob, the Mafia, the Costa Nostra. He has got to pay them. He is finished. He got caught. They don't want him at this point, sir. It is the old story. When they want someone on a job when he is found out guilty, he is employable [unemployable?]. * * *

They have paid me. I am going to give it to you straight, sir. They won't pay any fine for him and won't sit in jail for him.

I must respectfully suggest, sir—

THE COURT: Why should they pay you to come here and make a very effective speech for him?

MR. ABRAMS: I don't know how effective it is, sir. I feel this way, sir: They have run a business and we are not children and we know that lottery exists, whether it is operated by the State of New York and soon may be by the State of New Jersey or Monmouth or Garden State by the State or a bookmaker in Plainfield.

THE COURT: Why do they pay you to make a speech if they won't pay his fine?

MR. ABRAMS: That I can't answer. This I know to be a fact. Maybe because my fees are a little bit tough, sir. I don't know.

THE COURT: Maybe you ought to make it a little bit tougher.

MR. ABRAMS: I would like to, but they won't stand for it.

The news account having come to our attention, the matter was referred to the Union County Ethics Committee for its consideration. After extensive hearings, the Committee concluded there was no ethical violation. We thought the record called for the issuance of an order to show cause and hence we issued the order notwithstanding the Committee's conclusion.

On the face of respondent's plea to the sentencing judge, two ethical questions appear: (1) whether respondent had an understanding with a gambling syndicate to represent employees of the syndicate who might thereafter commit crimes associated with the syndicate's operation, and (2) whether respondent agreed with a syndicate to represent its employees charged with past crimes notwithstanding an inherent conflict of interest between such defendants and their superiors in the syndicate.

As to the first subject, it need hardly be labored that an attorney may not agree with an illegal syndicate to represent its members or employees with respect to future violations of the law. *In re Disbarment Proceedings,* 321 *Pa.* 81, 184 *A.* 59 (Sup. Ct. 1936); *In re Salus,* 321 *Pa.* 106, 184 *A.* 70 (Sup. Ct. 1936); *In re Davis,* 252 *App. Div.* 591, 299 *N. Y. S.* 632 (1st Dept. 1937); *In re Siegfried,* 265 *App. Div.* 964, 38 *N. Y. S.* 2d 948 (2d Dept. 1942); *In re Mogel,* 18 *App. Div.* 2d 203, 238 *N. Y. S.* 2d 683 (1st Dept. 1963). The controlling concept was well stated in *In re Disbarment Proceedings, supra,* 184 *A.* at 66:

> An attorney who agrees in advance to defend persons if and when arrested for criminal offenses whose future commission is a planned certainty, or from whose conduct such an agreement may be inferred, forfeits all right to practice law. Such conduct not only obstructs justice, but prevents the due administration of law. An attorney is under no obligation to aid his client in crime. His duty is to prevent its perpetration, if possible. An attorney may defend persons accused of participating in the numbers racket as writers, pick-up men, or bankers, and their clients need not be limited. It is not the number of persons defended that counts, but it is the regularity, character, and purpose of employment. When the purpose is to guide and aid a combination of persons engaged in crime, an attorney becomes part of the criminal system. Where a large number of cases of the same kind of crime are regularly defended by the same lawyer, where the defendants do not know and never have seen the lawyer prior to the moment of representation, and where the attorney's fees are paid by men known to be the leaders of a criminal system, a court may not only infer knowledge on his part of the criminal combination, but, from the frequency of his performance and knowledge, conclude that he becomes an actual participant therein. While ostensibly defending the writers, pick-up

men, and the like, the real employment is from the heads of the criminal organizations.

In the matter before us, respondent insisted that he had no prior commitment to anyone; that lottery cases came to him in sundry ways unrelated to such prearrangement. The subject is such that direct evidence of an illegal understanding would rarely be available. Circumstantial evidence of course may suffice. Respondent's own statements to the sentencing judge, quoted above, strongly suggested the syndicate was his employer. Apparently the Committee found therein more puff than reality. So viewed, what he said was at least in bad taste. And his testimony before the Committee could be read to import an unethical understanding with the syndicate. Respondent testified that he had theretofore represented Pickett (the man he mentioned in his remarks to the sentencing judge, quoted above) ; that Pickett recommended others to him; that about two years before he agreed to represent Young, he told Pickett that one such person had ignored his bill; that Pickett expressed surprise and after some inquiry told respondent that thereafter he, Pickett, would pay respondent his bills for services to individuals Pickett might recommend; that this became the practice and was the procedure followed with respect to Young. At any rate, the Committee concluded the charge was not made out that respondent had agreed to represent future violators, and the issue being factual and the record permitting the view the Committee took, we will accept its conclusion.

■ But, accepting the premise that respondent had no prior commitment to Pickett's organization, we nonetheless think it was improper for respondent to have accepted the organization's promise to pay his bill, for such an arrangement has the inherent risk of dividing an attorney's loyalty between the defendant and the gambler-employer who will pay for the services. Obviously, it is to the interest of the defendant's employer that the defendant shall not turn him

in. That is why the employer is willing to pay. As the Pennsylvania Supreme Court said in *Salus, supra,* 184 *A.* at 71:

> \* \* \* It is the latter [the bankers of the syndicates] who are anxious to protect the numbers writers so that they will have no cause for dissatisfaction and no occasion to disclose the operations of the system or the identity of parties by whom they are engaged.

It is of course to the advantage of the convicted defendant to seek leniency by aiding the State in its pursuit of his employer. *State v. De Stasio,* 49 *N. J.* 247, 256–258 (1967), *cert.* denied, 389 *U. S.* 830, 89 *S. Ct.* 96, 19 *L. Ed.* 2d 89 ·(1967). It is the duty of the defendant's attorney to advise him of that opportunity. An attorney is hardly well situated to discharge that duty when he has agreed to look to the syndicate for the payment of his fee.

██ A conflict of interest inheres in every such situation. It is no answer that Canon 6 of the Canons of Professional Ethics permits the representation of conflicting interests "by express consent of all concerned given after a full disclosure of the facts," or that Canon 38, restated in affirmative terms, would permit the acceptance of compensation from others with "the knowledge and consent of his client after full disclosure." Neither rule is relevant when the subject matter is crime and when the public interest in the disclosure of criminal activities might thereby be hindered. It is inherently wrong to represent both the employer and the employee if the employee's interest may, and the public interest will, be advanced by the employee's disclosure of his employer's criminal conduct. For the same reasons, it is also inherently wrong for an attorney who represents only the employee to accept a promise to pay from one whose criminal liability may turn on the employee's testimony.

An attorney must realize that the employer who .agrees to pay him is motivated by the expectation that he will be protected. It is urged upon us that the situation would

be the same if the attorney dealt only with the defendant but knew, believed, or suspected his client would look to the employer for reimbursement for the cost of the defense. The situations are not the same. And the difference is not an empty form, for a direct understanding with the employer will likely weaken the attorney's resolve to serve exclusively the interest of his client, no matter what the attorney may himself think. And even if the attorney's devotion to his client was not in fact diminished, still the arrangement may suggest to others that it was. Appearances too are a matter of ethical concern, for the public has an interest in the repute of the legal profession. Surely respondent's statements to the sentencing judge did not enhance the image of the Bar.

Respondent says he in fact urged his client Young to turn upon Pickett. He stresses that his plea for Young, quoted above, stated that Young had revealed Pickett. But the ethical violation inheres in the improper arrangement and does not depend upon what did or did not follow in its wake. And we must add, without intending thereby to enlarge the charge against respondent, that the record indicates his claim in this regard is quite hollow. To begin with, Pickett, who was already well known to the police, was arrested with Young at the same time and place. Further, Young seemingly said nothing to incriminate Pickett. It developed at the hearing before the Ethics Committee in June 1969 that the charge against Pickett had not been tried although Young had been sentenced on December 16, 1968. Our inquiry revealed that the charge against Pickett, pending in the Woodbridge Municipal Court, was for failure "to give a good account of himself," a disorderly persons offense. Our inquiry apparently led to a trial in that court, and, we have been advised, Pickett was found guilty and "was fined $15.00 and $10.00 costs, which were paid."

The judge who sentenced Young apparently was moved to suspend the sentence by the representation that Young had aided law enforcement. If Young did, his aid hardly en-

veloped Pickett. We add that before the Ethics Committee Young protected Pickett. Before the Committee Young, and Pickett too, denied under oath everything that could involve Pickett in criminal liability. Young swore that he himself paid the fee to respondent, and Pickett swore that he did not make that payment and that he had never arranged with respondent for the payment of fees for services to anyone. The testimony of Young and Pickett flatly contradicted respondent's testimony. As to this, the Committee believed respondent. But it is plain that the impropriety in the arrangement respondent made with Pickett was hardly palliated by the later events.

As we have said, the Ethics Committee initially found no unethical behavior. In its brief, the Committee asked that in fixing the discipline we bear in mind that we are "applying ethical principles, which it is common knowledge, have not been generally observed by many attorneys in the past." The Committee cites *In re Kamp*, 40 *N. J.* 588, 599–600 (1963), where we imposed only a reprimand because we thought a considerable portion of the Bar was unaware of the ethical problem there involved. It is true that we have no reported opinion touching the immediate subject, and we assume that in urging leniency the Committee has in mind as well that respondent's long record at the Bar is otherwise unblemished. In the light of the Committee's recommendation the discipline is limited to a reprimand which, as we said in *Kamp*, "is not to be taken as a measure of future discipline."

*For reprimand*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.