**UNITED STATES of America**

v.

**Paul CASTELLANO, et al., Defendants.**

**No. SSS 84 Cr. 63 (ADS).**

United States District Court,
S.D. New York.

May 1, 1985.

On Motion To Prevent Disclosure
May 6, 1985.

See also 610 F.Supp. 1359.

Rudolph W. Giuliani, U.S. Atty. for the S.D. of N.Y., New York City, for the U.S. of America; Walter S. Mack, Jr., Mary Lee Warren, Michael Kellogg, of counsel.

Gerald L. Shargel, New York City, for defendant Richard Mastrangelo; Jonathan J. Silbermann, of counsel.

## OPINION AND ORDER

SOFAER, District Judge:

On March 5, 1985, this court issued a preliminary opinion on the government's motion to disqualify Gerald L. Shargel,

Esq., from representing Richard Mastrangelo at the trial of this criminal action. *United States v. Castellano*, 610 F.Supp. 1137 (S.D.N.Y.1985) ("*Shargel II* "). That opinion set out the background for the government's motion, and the arguments raised by the government at that time to require Shargel's disqualification.

The government originally advanced three bases for disqualifying Shargel: (i) his invocation of the fifth amendment privilege against self-incrimination with respect to his relationships with several of the defendants in this multidefendant case; (ii) the potential conflicts of interest engendered by his prior representation of a number of Mastrangelo's co-defendants; and (iii) the necessity that he appear as a witness. In light of Mastrangelo's sixth amendment interest in retaining the counsel of his choice, *see United States v. Cunningham*, 672 F.2d 1064, 1070 (2d Cir. 1982), and for other reasons stated in *Shargel II*, the government's position based on Shargel's mere invocation of the privilege against self-incrimination was rejected. The government made a sufficient demonstration at that time, however, to warrant further proceedings and consideration as to whether Shargel could conceivably face prosecution for perjury or obstruction of justice, and whether his testimony as a witness would be appropriate or necessary. Further inquiry followed, including an *in camera* hearing which Mr. Shargel and Mr. Mastrangelo attended, at which a cooperating witness (designated "Witness A" in *Shargel II*) testified and was examined by the court. Also present, at Mr. Shargel's request, was James M. LaRossa, Esq., lead defense counsel in *Castellano*. The government and Shargel then made additional submissions.

The relevant information and testimony has established that the government has no adequate justification for calling Shargel as a witness based on his claimed knowledge concerning particular acts of racketeering or substantive counts. Shargel's testimony before the grand jury indicates that he is unlikely to provide evidence directly helpful to the government. The government has, however, presented a substantial case for using Shargel's activities and practices as an attorney to help establish the existence of a relationship among several of the defendants suggestive of an organized crime "enterprise" under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). 18 U.S.C. § 1961(4) (1982).

Shargel concedes that if the government is permitted to present this theory to the jury then "obviously I have no place represent[ing] Mr. Mastrangelo." Transcript of Pre-Hearing Conference at 22 (Mar. 1, 1985) ("Conference Tr."). Whether Shargel should be called as a witness and should therefore be ordered to withdraw as counsel depends in this case on the relevance and admissibility of the independent evidence concerning his conduct and knowledge. *See Cunningham*, 672 F.2d at 1074–75. An order was entered on April 1, 1985, disqualifying Shargel, as the record now demonstrates that the testimony concerning Shargel is relevant and admissible; that Shargel's own testimony will be relevant and may be prejudicial to his client; and that the public interest in Shargel's testimony overrides Mastrangelo's right to be represented by the counsel of his own choice.

I. *The Relevance and Admissibility of Testimony Concerning Shargel.*

At trial the government must prove the existence of the criminal enterprise charged in the indictment, a street "crew" led by the late Roy DeMeo. Indictment ¶¶ 2–3. This alleged enterprise was an "association in fact," rather than a formal legal entity. To prove its existence, the prosecution must show that it was "an ongoing organization ... [whose] various associates function[ed] as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). Thus, any evidence that tends to show common interests, economic relationships, or a hierarchical structure involv-

ing the defendants will be relevant to this element of the government's case.

### A. *Witness A's Testimony.*

Witness A, a close associate of DeMeo who claims to have been a member of the enterprise, will testify at trial to a meeting, described in *Shargel II*, at which he watched DeMeo give Shargel a brown paper bag which DeMeo told Witness A contained $100,000 in cash. Witness A testified at the hearing held on this motion that DeMeo also told him the payment was for the legal fees of two other crew members, Gaggi and Dordal:

Q. And did you know the reason you were driving to that location?

A. To see Mr. Shargel.

Q. And did Mr. DeMeo tell you that?

A. Yes, he did.

Q. And what did Mr. DeMeo tell you about the purpose of that drive to that location?

A. That he had to bring him money for Nino's [defendant Anthony Frank Gaggi] case and for Paul's case.

Q. And when you say Paul, you are referring to what individual?

A. Paul Pinto I knew him as [an alias which the government contends was used by defendant Paul Dordal].

Transcript of Evidentiary Hearing at 7–8 (Mar. 7, 1985) ("Hearing Tr."). Witness A also testified that another alleged crew member, Henry Borelli, told him that Shargel demanded high prices, and that Borelli had paid some of Dordal's fees. *Id.* at 11–12. This testimony about benefactor payments will be corroborated by Witness B, as indicated in *Shargel II*, 610 F.Supp. at 1144, and may be supported by other evidence. Although Witness A also testified that, in one instance, he was required to sell his car to pay an attorney's fee, Grand Jury Tr. at 242 (Mar. 14, 1984), his testimony suggests that on other occasions (or in the absence of available assets) the crew might pay. His testimony in response to the court's questioning also suggests that Shargel served as an agent of the enterprise in arranging such payments:

Q. When you were at the MCC and you were told that Mr. Hoffman [ostensibly Witness A's attorney. *But see infra.*] would be paid—

A. Yes.

Q. —who did you understand would pay the money actually to your lawyer?

A. Gerry.

Q. Mr. Shargel would pay it out of his own pocket?

A. No, that he was going to take care of it. I don't know who was going to give him the money.

Q. Well, did you understand—

A. The guys were going to give him the money.

Q. The guys were?

A. Yeah.

Q. You mean the people in the crew?

A. Yes.

Q. Was it your brother that was going to give him any money? [This possibility was suggested to the court by Messrs. Shargel and LaRossa.]

A. My brother?

Q. Yes.

A. My brother couldn't even pay attention.

Q. And the $2,000 that was finally paid, do you know where it came from?

A. No, I don't.

Q. You don't know whether it came from your brother or not?

A. No, my brother didn't have a dime.

Hearing Tr. at 31–32.

The jury could conclude that DeMeo's benefactor payments, if in fact they were made, reflected interests other than friendship or a detached concern for the sixth amendment rights of colleagues. The conviction and incarceration of various members of his crew would impair its ability to carry on its operations, and the jury could conclude that he defrayed these legal expenses because they were a cost of doing the business of the crew.

The government also intends to present evidence that DeMeo and other leaders of the crew picked the actual attorneys who represented crew members. *See* Grand Jury Tr. at 241–43 (Mar. 14, 1984). Witness A explicitly stated that "they"—meaning DeMeo and other leaders of the crew—decided which lawyer would represent a crew member in trouble: "You got [to] use the lawyers that they assign to you. This way, if you're doing anything wrong, they would know about it." *Id.* at 242. By picking a crew member's attorney, in addition to paying him, a crew leader can require him to use an attorney who will supply the leader with information, or seek to keep his nominal client from cooperating, or from otherwise harming the crew's interests. In one instance, Witness A testified, DeMeo arranged a change of attorneys, apparently because the first attorney seemed too ready to enter a plea of guilty on one alleged crew member's behalf to avoid endangering the position of the alleged boss. *See id.* at 242–43. *See also In re Grand Jury Subpoena Served Upon John Doe, Esq.*, 759 F.2d 968, 970 (2d Cir. 1985) ("*John Doe*"); *id.* at 984 n. 9 (Timbers, J., dissenting).

Witness A provided additional details concerning this issue which directly implicate Shargel. He testified that, during his confinement in the MCC in 1983, he received an unsolicited visit from Shargel, who expressed his condolences to the witness over DeMeo's death. Witness A testified that Shargel said he could not represent the witness because of a conflict, in that Shargel was then representing Gaggi (charged in the indictment as one of the crew's leaders). Shargel allegedly introduced the witness to an attorney, Jeffrey Hoffman, Esq., and told A that Hoffman would be his lawyer. Shargel also allegedly told the witness that he (Shargel) would arrange for the payment of Hoffman's fees, and then proceeded to question A as to whether he was cooperating with the government and to encourage him not to do so. The witness testified:

Q. Can you in as much detail as you can recall, indicate how Mr. Shargel came to see you?

A. Yes. Mr. Shargel had—he told me that he couldn't see me because it was a conflict of interest, so Jeff Hoffman had came and Mr. Shargel, and Mr. Shargel had sent for two other inmates, one fellow's name was Joseph Delveccio and another fellow's name was Mike Donnyboy or Mikeyboy.

Q. And where did this occur, Mr. [A]?

A. In the attorneys' office, in the attorneys' room in MCC New York.

Q. And who was Jeff Hoffman?

A. Jeff Hoffman was supposed to be my attorney.

Q. And are you saying that you met and had a conversation with both of those attorneys present?

A. No. I spoke to Gerry first alone when he had told me about Mr. De-Meo telling him what a great guy I was and what he thought of me.

Q. I would like you to tell the court in as much detail as you can recall what you remember about what Mr. Shargel said to you on this first occasion.

A. He told me he wasn't allowed to see me because it was a conflict of interest and that he was representing Nino Gaggi after Mr. DeMeo had got killed.

Q. And did he indicate to you—well, what else, if anything, did he say to you?

A. He says to me, "I don't know if they have a case here," he says, but he had gave me his card, which I have in my pocket, and he says, "If there is any help I can give you, just give me a call, but Jeff Hoffman is going to be your attorney and I'll take care of Jeff Hoffman."

\* \* \* \* \* \*

Q. Again, on this first meeting, was there any discussion about legal fees?

A. That he was going to take care of the legal fees with Jeff Hoffman.

Q. And this is what Mr. Shargel said to you?

A. Correct.

Q. Had you asked or had you requested that Mr. Shargel come in to see you?

A. No, I did not.

Hearing Tr. at 12–13, 14–15. Witness A also testified about a second meeting:

Q. With respect to the second meeting, where did that occur?

A. In MCC New York.

Q. And did you request that Mr. Shargel come in to see you on that occasion?

A. No, I did not.

Q. How did Mr. Shargel arrange to see you?

A. He sent for the same two inmates, three inmates and Jeff Hoffman sent for me.

Q. And was Mr. Hoffman present in your conversation or while the conversation with Mr. Shargel occurred?

A. We had sat for a few minutes in a room, me and Gerry.

Q. And at this second time could you, in as much detail as you can recall, indicate what was said?

A. Well, he asked me what they had on the case, and I told him that they had nothing.

Q. Was there any discussion, or maybe you might—concerning any particular individuals, other persons involved in the case other than [Witness B] on this second meeting?

A. He had asked me about Ronny Ustica. He said, "What kind of guy is he," and he asked me if he was going to hold up, and I says, "I don't know." And the Arab.... The Arab was a fellow we used to ship the cars to in Kuwait and he used to fly up every once in a while to see how the operation was going [Ustica and the "Arab" are both defendants in this case].

\* \* \* \* \* \*

Q. Were you ever questioned by Mr. Shargel as to whether or not you were providing information to the government?

A. Yes, he did ask me, he said, "You didn't say nothing, did you?"

I said no.

He said, "You sure?"

And I'm not positive if it was Shargel or Jeff asked how I went back to the prison I was at.

Q. Please describe to the Court the significance of that and what they asked you?

A. They asked me how I got back, and I said through the marshal service.

They said, "the marshals took you back, you know, by yourself?"

I said no, there were other inmates that went to a differ[ent] institution with me.

Q. Was there discussion about how legal fees were to be paid?

A. He was going to take care of the legal fees with Jeff.

Q. Who was "he"?

A. Gerry.

Q. And did he indicate where he was going to obtain the money for legal fees?

\* \* \* \* \* \*

A. No, no.

The Court: He just said he would take care of it and you accepted that?

The Witness: Yes.

The Court: Did you understand him to mean something? What did you—

The Witness: Well, when Jeff came to see me, Jeff kept telling me he was never getting no money, he didn't get no money yet, he didn't get no money yet, and finally he got $2,000.

Q. Did Mr. Hoffman indicate to you that, in fact, at a later time he did receive some money?

A. Yes, he did, he received $2,000.

Hearing Tr. at 15–16, 17–18, 18.

After discussing possible lines of inquiry *in camera* with Messrs. LaRossa and Shar-

gel, the court questioned Witness A further about his discussions with Mr. Shargel:

Q. Did you in your discussions with Mr. Shargel and Mr. Hoffman, did you indicate to them during that time that the government attorneys were trying to speak to you or were speaking to you?

A. I think I did. Yes, I did, your Honor.

Q. What had you told them?

Let's go back to that first meeting with Shargel, what did you tell him there about that subject?

A. I don't recall exactly, I just told him that I was offered, you know, to go on the program.

Q. You told him that you were offered by the government to go in the witness protection program?

A. Yes, that my life was in danger, which I didn't hear from the government, I heard from people in the street.

Q. And did you tell him that you were ... invited to discuss things with the prosecutor?

A. Yes, I did.

Q. And had you told them those things before Mr. Shargel asked you if you would cooperate?

A. I don't recall, your Honor.

     \*      \*      \*      \*      \*      \*

By Mr. Mack:

Q. And what did Mr. Shargel say?

A. I think he had told me don't go for it because they don't have nothing for the case, they don't have a case. He said if they had a case that they would come down on the case.

Hearing Tr. at 32–33, 34.

Shargel attacks the relevance and significance of Witness A's testimony. Shargel has never denied receiving cash from De-Meo in a brown paper bag in lower Manhattan; he claims, though, that the bag contained only $2,000, not $100,000, and that the payment was for DeMeo's fees, and did not represent payment for "any services rendered or to be rendered to Mr. Dordal, Mr. Gaggi or anyone else." Grand Jury Transcript at 66 (Aug. 22, 1984). Moreover, Shargel denied ever having received "benefactor payments" in connection with his representation of any of the defendants or co-conspirators involved in this case. *See Shargel II*, 610 F.Supp. at 1143. Shargel also admitted meeting with Witness A at the MCC, but he argues that the witness' version is either inaccurate or fails to indicate any impropriety:

A review of the record leaves completely confused the question of what was said at which meeting. If the meetings are simply taken as a whole, the testimony reveals (1) that I told [Witness A] that I couldn't represent him because of a conflict of interest; (2) that I asked [Witness A] about the strength of the government's case, particularly his view of the strengths and weaknesses of an individual already known to have been cooperating with the government and two other individuals who are defendants in the present indictment; (3) that I was told by [Witness A] that he was invited to become a government witness and enroll in the Witness Protection Program; (4) that I asked him whether he had already furnished information to the government; (5) that I expressed the view that [Witness A] should not accept the government's invitation because in my opinion the government did not then seem to have a case against him; and (6) that I told [Witness A] that I would arrange to have Jeffrey Hoffman, Esq., paid, according to [Witness A's] understanding, by the people in the crew.

The only troubling aspect of Mr. [A's] contention is the claim that I would secure money from members of the "crew" to pay for [Witness A's] legal representation by Hoffman. However, the government does not claim that I actually arranged or made payment to Mr. Hoffman since it knows full well that I did not....

Focusing on my conversation with [Witness A], I see absolutely no ethical or criminal violation in our conversations as *he* relates them. Even if I were not actually representing Mr. [A] at the time,

I was not precluded from having a confidential conversation with him about the strengths or weaknesses of the government's case. Even though I would not be representing [Witness A] at any upcoming trial there was a joint defense privilege which, until [Witness A] testified, protected these communications. Most importantly, I maintain that there was absolutely nothing wrong or untoward about the opinion I expressed to Mr. [A] on the basis of the information that he confidentially related to me.... I did not tell him to refrain from cooperating because his life was in danger; I did not tell him to refrain from cooperating because the crew members wouldn't like it or would provide for him if he remained loyal. Rather, according to [Witness A's] own testimony, I told him that in my opinion he shouldn't cooperate because "they don't have a case." The government, although sprinkling innuendo throughout this motion, has failed to produce one speck of proof that I was sent or asked to go to the MCC by anyone else with a view toward mollifying Mr. [A]. In short, the government's evidence on this issue is patently inadequate—the probative value, if it exists at all, is extremely low.

Letter to the Court from Gerald L. Shargel, Esq. at 2–3 (Mar. 11, 1985) (citations omitted; emphasis in original).

Shargel's arguments fail to rebut the relevance and potential probative value of this evidence. That DeMeo actually passed $100,000 in cash to Shargel in a paper bag as small as indicated by Witness A may be unlikely.[1] Yet, a jury may conclude that Shargel's story of having received only $2,000 at that time is also unlikely. The real issue, moreover, is not the actual amount of money in the paper bag, but the purpose for which the money, in whatever amount, was transferred. Witness A's story about the cash payment in a paper bag is corroborated by Shargel himself in many of its details, and is potentially convincing, since A will also testify that he worked for DeMeo, and that the crew arranged to pay his own legal fees.

The testimony about Shargel's visits to the MCC suggests that some crew members were paying Shargel for legal services performed for other crew members, and were also choosing attorneys for members who got in trouble. This testimony remains uncontroverted. Shargel has testified that Witness A "sought legal advice from me." Grand Jury Tr. at 36 (Aug. 20, 1984). But this testimony differs from a claim that A sent for Shargel. Furthermore, Shargel carefully refrained in the grand jury from claiming that he actually represented A,[2] and admitted representing other defendants at the time of his visits, though he noted "that this was before there were arrests and this was before there was a claim by the grand jury that these people were part of one single conspiracy." Id. at 38–39.

---

1. Witness A admitted he had not looked into the paper bag at any time, Hearing Tr. at 10, and described the paper bag, in which the money had been wrapped with a rubber band, as less than an inch thick, id. at 20. He said that, although he had never seen $100,000 in $100 bills, he had seen $10,000 in $100 bills and that a package of that amount would be approximately one-half the thickness of the package that he had seen DeMeo give to Shargel, id. at 30. In response to the court's question, "Do you really thin[k] there was a hundred thousand dollars in there?," Witness A answered, "I don't know, your Honor.... I don't know." Id. at 29. He had earlier testified that DeMeo told him the "big" paper bag that he said DeMeo gave Shargel contained $150,000. Grand Jury Tr. at 246 (Mar. 14, 1984).

2. In his appearance before the grand jury, Shargel refused to answer any questions about the contents of his conversations with Witness A on the ground that he was bound by the attorney-client privilege. Grand Jury Tr. at 18 (Sept. 5, 1984). After the hearing on this motion, the court concluded that, in light of his testimony, Witness A had "waived his attorney-client privilege ... if he had any vis-a-vis Shargel." Hearing Tr. at 36. Shargel was thereupon invited to respond to Witness A's testimony. He chose to respond by letter rather than by affidavit, analyzing the potential significance of Witness A's testimony about the meetings in the MCC, on the assumption that the testimony he heard is true. See Letter to the Court from Gerald L. Shargel, Esq., at 2–3 (Mar. 11, 1985).

If the jury believes Witness A, they might conclude that Shargel's activities were probative of the existence of an enterprise in which DeMeo, and other crew leaders, treated attorneys' fees as a cost of doing business, and as a means for selecting attorneys who would function with the crew's interests in mind. DeMeo's payment of the legal fees of two men alleged to have been members of his crew could readily be interpreted as probative of some association in fact among DeMeo, Gaggi, and Dordal, and could suggest that DeMeo occupied a position of authority within that association, since the responsibility to assure legal representation was his. Shargel's apparently uninvited appearance at the MCC to discuss the legal problems of an enterprise member could suggest he was acting in effect as a "house counsel" for the enterprise. That Shargel informed Witness A that he could not represent him, despite the fact that Witness A claims not to have asked Shargel to represent him in the first place, further suggests that Shargel represented members of the alleged crew as a matter of course. Witness A's account also implies that Shargel was responsible for arranging alternative counsel for A, and would remain available to advise the witness if needed, despite the conflict he said existed. That Shargel told the witness how sorry he was that DeMeo had been killed because he knew that DeMeo and the witness were good friends indicates that Shargel knew of the witness' connection at least to DeMeo. Shargel's questioning of Witness A at a second meeting about both the strength of the government's case and A's potential cooperation with the government also could be construed as supporting the government's theory. Shargel once again arranged to meet, uninvited, with Witness A while appearing to be visiting other inmates. Since Shargel was not representing Witness A, the jury could conclude that his discussion with A must have occurred because obtaining information about A's possible cooperation was in the interest of some other client or clients, another one or more enterprise members.

### B. *Shargel's Testimony.*

A lawyer must withdraw from a case in which an adverse party seeks to call him as a witness when it becomes "apparent that his testimony is or may be prejudicial to his client." N.Y.Jud.L. (app.) Code of Professional Responsibility DR 5–102(B) (McKinney 1975). Under the circumstances of this case, the government seeks to call Shargel because it believes that the jury will reject his accounts of the meetings involved and his explanations of his legal practice, to the extent that this testimony tends to rebut the existence of an enterprise. The finders of fact are entitled to infer from the substance and manner of a witness' statement "not only that the witness' testimony is not true, but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies." *Dyer v. MacDougall,* 201 F.2d 265, 269 (2d Cir.1952) (Learned Hand, J.). *See also United States v. Geaney,* 417 F.2d 1116, 1121 (2d Cir.1969) (citing *Dyer* for the proposition that the implausibility of a defendant's exculpatory explanations may lead court to find sufficient basis for admitting co-conspirator statements against him), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970).

The government has presented a sufficient case to establish that Shargel's anticipated testimony will be relevant and may be prejudicial to Mastrangelo, and to other, former clients. Shargel admits having represented, to some extent, 8 of the 21 defendants facing trial on the present indictment. The Second Circuit has declared that "the fact that a lawyer has multiple clients in no way implies a connection between them." *In re Shargel,* 742 F.2d 61, 63 n. 3 (2d Cir.1984) ("*Shargel I*"). This observation was made, however, in the context of Shargel's then unchallenged claim that he had received no benefactor payment from any of his clients, and in the absence of other, probative evidence of a

**1160**

connection among his present and former clients. *See id.* at 64; *In re Grand Jury Subpoena Duces Tecum,* No. M11–188, slip op. at 3–4 (S.D.N.Y. Apr. 26, 1984); Supplemental Memorandum in Support of Government's Motion To Disqualify Gerald L. Shargel, Esq. at 1.

In *Shargel I* itself, the Court recognized that benefactor payments of attorneys' fees by one defendant in behalf of another might suggest the existence of an association in fact, since "payment of another person's legal fees may imply facts about a prior or present relationship with that person." 742 F.2d at 64; *see John Doe, supra,* at 970–976 (government had shown relevance of subpoena for attorney's fee information that might show benefactor payments to claim of RICO enterprise); *United States v. Pape,* 144 F.2d 778, 782 (2d Cir.) (in case involving Mann Act violation, defendant's payment of legal fees for woman accused of prostitution could be used to show that defendant's "interest in the woman went to the point of retaining and paying for a lawyer to secure her release"), *cert. denied,* 323 U.S. 752, 65 S.Ct. 86, 89 L.Ed. 602 (1944); *cf. In re Grand Jury Subpoenas Dated April 19, 1978,* 451 F.Supp. 969, 972 (E.D.N.Y.1978) (attorney-client privilege regarding third-party payment of fees does not apply when there is strong evidence that "law firm was retained pursuant to an ongoing criminal enterprise ... and that the firm was retained in an effort to conceal the conspiracy [and] to obstruct justice").

The Second Circuit has also recognized that the decisions of multiple defendants to use the same attorney or accountant may, in appropriate circumstances, suggest a connection among them. In *United States v. Barnes,* 604 F.2d 121, 147 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980), the Court noted that the defendants had all filed tax returns reflecting large amounts of unexplained income and that all their tax returns were prepared by the same law firm in Detroit, "a city quite distant from the alleged sites of the defendants' operations." It found this latter fact "relevant ... to establish the existence of the conspiracy and its membership." *Id. Barnes* implicitly stands for the proposition that, when other suspicious circumstances are present, the decision of a number of persons to retain the same lawyer may be probative of an association among them. In this case, Shargel represented or performed services for, not just 2 or 3 defendants, but at least 8. Furthermore, he admitted that one of these clients was referred to him by one of the client's alleged fellow-crew members. *See* Grand Jury Tr. at 22 (Sept. 5, 1984). Such referrals are consistent with the government's claim that Shargel was a regular attorney for members of the enterprise facing legal difficulties.

In addition, a jury might well choose to reject Shargel's claim that he has received no benefactor payment. Apart from the possibility that a jury might find Shargel's demeanor unconvincing, and might be persuaded by the testimony of Witnesses A and B, the jury may give weight to the suspicious circumstances under which Shargel received his fees, particularly the cash payment on a street corner, in a brown paper bag. Furthermore, as indicated in *Shargel II,* the jury may construe Shargel's decision sometime after February 28, 1984 (the date on which *United States v. Doe,* 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984), was decided) to destroy all his existing appointments records, and to keep no new ones, *see* Grand Jury Tr. at 21–22 (Aug. 22, 1984), as a desire on his part, not merely to avoid being called as a witness against his clients, but also as a way of preventing the government from acquiring evidence that could in fact be used to help prove his clients' guilt. In early 1984, Shargel was representing Joseph Testa, another of the alleged co-racketeers, in connection with an ongoing grand jury investigation that resulted in the issuance of a superseding indictment, filed on March 29, 1984, which added the RICO charges. A jury may construe Shargel's behavior in destroying his records as indicating his consciousness that the doc-

uments were probative of a RICO enterprise.

The jury might also wonder why Shargel performed services for several alleged crew members without compensation, as he testified. They might view his explanation as a device for masking the fact that his principal clients—the crew leaders—paid him enough to cover all his assigned activities. The jury may in particular choose to disbelieve Shargel's testimony as to what he was paid by those from whom he admits having received money. The amounts he testified he received for services to DeMeo and Gaggi may prove low in comparison to amounts earned for similar work by lawyers of comparable reputation and ability, and Shargel's lack of any records of his income, and the manner in which he claims he is paid and keeps track of his money, may make jurors skeptical as to his veracity in general. Moreover, the jury might conclude that Shargel's policies regarding recordkeeping were adopted at the behest of his clients, *see* Conference Tr. at 32–33, and that he acted as their agent. The jury could conclude that, by failing to keep records, Shargel is able drastically to understate the fees paid by particular clients, so that the clients could receive legal services the value of which clearly exceeded their income from legitimate sources. By keeping no records, Shargel has turned all these questions into tests of his credibility, which can be resolved only by the jury.

Shargel's testimony concerning his visits with Witness A at the MCC may also assist the government in proving its case. An attorney-client visit would have created no adverse implications. But a jury may conclude that Shargel visited Witness A as a representative of other enterprise members. Thus, if Mastrangelo himself had visited Witness A, had told him that he would help arrange for A's legal representation, and had asked A pointed questions about what he and other potential witnesses had told the government, that evidence would be admissible. Shargel may challenge Witness A's testimony in these respects, but a jury should be free to choose which version to believe.

In light of the government's claims regarding Shargel's involvement, even if the government were to decline to call Shargel, he ought to be called as a defense witness to controvert Witness A's testimony about benefactor payments and the suggestions implicit in A's testimony about Shargel's visits to the MCC. Shargel will be an impressive, perhaps crucial, witness for the defense on the issue of benefactor payments, and without his testimony the jury might more likely believe Witness A's version than if Shargel testifies. The absence of any documentary evidence as to the amount and purpose of DeMeo's payment, as to the actual payment of fees by those defendants who retained Shargel, and as to what occurred at the MCC means that only Shargel can rebut the claims made by the government's cooperating witnesses: "If [Witness A's] testimony is admitted at trial, it requires no great leap of the imagination to conclude that [Shargel] ought to be a rebutting witness, either to deny [Witness A's statements], or to provide an innocent explanation for the jury to consider." *Cunningham*, 672 F.2d at 1074. Shargel's letter to the court concerning Witness A's account of the meeting at the MCC, for example, provides an alternative perspective on events that the government has chosen to characterize in a culpable light. The defense ought, therefore, to call Shargel as a witness to undermine the credibility of the government's witnesses and theories.

In addition to this general defense need to call Shargel, at least one defendant, Judith Hellman, wishes to call Shargel to rebut the government's claim that her testimony at the post-trial proceedings in *People v. Gaggi*, Ind. No. 3325/79 (Sup.Ct. Kings Co.), which form the basis for acts of racketeering 32 and 35 alleged in count one, was the result of bribery. She claims that Shargel helped prepare her to testify, and that he had learned of independent corroborating evidence for her testimony. *See* Affirmation of Richard S. Berne ¶¶ 27–28 (Jan. 14, 1985). Mastrangelo is not alleged to have had any involvement

with this episode, and thus the substance of Shargel's testimony might not require disqualification under DR 5–102(B). But the fact that Mastrangelo's attorney was involved, however nonculpably, in an ostensibly unrelated incident that allegedly involved eight co-racketeers could suggest to the jury that Mastrangelo has some connection with that group.

■ The Second Circuit rule is clear: when a lawyer possesses evidence that ought to be used to rebut the government's case in chief, DR 5–102(A) requires disqualification, even in criminal cases. *See Cunningham,* 672 F.2d at 1074–75. Moreover, Mastrangelo and the other defendants who might need such rebuttal testimony cannot waive their right to call Shargel in order to permit him to remain as counsel. *Cunningham* stated that, if the district court determined on remand that the testimony of the government's other witness was admissible, then "it *should* adhere to its disqualification" of defendant's counsel, *id.* at 1075 (emphasis added); only if it concluded that the other testimony would be admissible solely in rebuttal of specific arguments by the defendant could the defendant be given the opportunity to waive his right to make such arguments and thus to keep his counsel, *id.; cf. MacArthur v. Bank of New York,* 524 F.Supp. 1205, 1208–09 (S.D. N.Y.1981) (DR 5–102(A) turns on whether lawyer "ought" to testify as standard for disqualification, not on whether client is willing to waive his right to have lawyer testify).

C. *The Admissibility of Testimony Under Rule 403.*

The testimony concerning Shargel's activities appears to meet the ordinary tests of admissibility. Witness A's account of DeMeo's statements to him concerning the purpose of the payment to Shargel will likely be admissible pursuant to the co-conspirator exception for hearsay. Fed.R. Evid. 801(d)(2)(E). His testimony as to his meetings with Shargel faces no hearsay objection at all. Mastrangelo argues, however, that Witness A's testimony should be

precluded under Fed.R.Evid. 403 as unfairly prejudicial because its admission would require him to call Shargel, thereby causing him to lose the ability to retain the lawyer of his choice. This result, he argues, is "unfair prejudice" under the rule.

■ The unfair prejudice against which Rule 403 provides protection, however, is evidentiary. Rule 403 is meant to ensure that evidence presented to a jury does not mislead it. Mastrangelo does not claim that either Witness A's testimony or Shargel's would improperly enflame or otherwise mislead the jury on the question whether an enterprise existed. Rather, he is claiming that the jury's verdict as to him may be adversely affected by the fact that he is forced to retain or accept assignment of another attorney. But the status of the person through whom probative evidence is adduced is not one of Rule 403's concerns. In *United States v. Frankenthal,* 582 F.2d 1102 (7th Cir.1978), for example, the prosecution called a federal judge to testify about a meeting with one of the defendants' attorneys. On appeal, a different defendant claimed that Rule 403 should have precluded this testimony, because the judge's position gave unwarranted prestige to the government's case. The Seventh Circuit rejected this position, noting that, although a jury might be affected by the position of a witness, "Judge Gordon possessed factual knowledge that was highly pertinent to the jury's task, and he was the only possible source of testimony on that knowledge." *Id.* at 1108. If the prosecution is otherwise justified in calling an attorney as a witness, "[i]t is inconceivable that defendant's right to a particular counsel should be permitted to impose ... artificial disadvantages upon the government," by restricting whom it can call at trial. *United States v. Cortellesso,* 663 F.2d 361, 363 (1st Cir.1981).

Shargel's behavior, if he is unable to provide a sufficiently innocuous and plausible explanation for it, does pose a serious danger of prejudicing his client. The nature of this potential prejudice, however, stems from the fact that evidence suggest-

ing that Shargel was an agent of the enterprise may tend to tie his clients, including Mastrangelo, to each other and to the enterprise. This prejudice would not be "unfair" under the rule, since in this case the government must prove the connection among defendants that Shargel's activities may tend to suggest. The government needs precisely the sort of evidence that Witness A and Shargel may provide. An "enterprise in fact" cannot be proved to exist in the way in which one is able to establish the existence of a corporation or other formal entity. The government may be able to place testimony before the jury directly confirming the existence of an enterprise. But this evidence—especially if it is the testimony of cooperating co-conspirators—will need corroboration by the kind of evidence that Witness A and Shargel may provide. *See John Doe, supra.*

The government's decision to call Shargel as a witness embodies a risky tactical judgment. The jury may well credit the testimony of an able and articulate attorney over the statements of a convicted felon testifying pursuant to a cooperation agreement. *See, e.g.,* Conference Tr. at 17, 19. But the government is entitled to run this risk, since Shargel's testimony is relevant and will prejudice his client if the jury accepts the government's interpretation. Indeed, the government may face a serious risk by not calling Shargel, since the repeated mention of a defense lawyer whom the government does not call to testify might suggest to the jury that the government had decided that his testimony might damage its case. *See Cortellesso,* 663 F.2d at 363. To avoid this inference, the government should be permitted to call Shargel.

## II. *The Propriety of Shargel's Disqualification.*

Shargel argues that his disqualification is improper, because he has sought in his conduct only to represent his clients most effectively. He suggests that the government should not be permitted to deprive Mastrangelo of the highly effective services he has thus far rendered. *See, e.g., Cunningham,* 672 F.2d at 1075; *United*

*States v. Crockett,* 506 F.2d 759, 760–61 (5th Cir.), *cert. denied,* 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975); *United States v. Fiorillo,* 376 F.2d 180, 185 (2d Cir.1967); *cf. Rice v. Barron,* 456 F.Supp. 1361, 1370 (S.D.N.Y.1978) (rules against counsel appearing as a witness "w[ere] not designed to permit a lawyer to call opposing counsel as a witness and thereby disqualify him as counsel"). Would Shargel's disqualification, under the circumstances of this case, tend to undermine the adversarial process by discouraging the zealous representation that the law not only values but demands? In addressing this question in the present context, we are not concerned with whether Shargel has in fact behaved illegally or unethically. Rather, our concern is whether the forms of conduct in which the jury could find that Shargel has engaged are valued by our system of criminal justice, and therefore should not be discouraged through orders of disqualification.

No serious argument can be made to support the propriety of accepting payments of legal fees by persons other than one's client when those other persons have their own, potentially conflicting interests. Benefactor payments pose a danger that the lawyer receiving them will put the interests of the payor ahead of the interests of his nominal client. *See, e.g., Code of Professional Responsibility,* Ethical Considerations 5–22, 5–23. In *Wood v. Georgia,* 450 U.S. 261, 268–69, 101 S.Ct. 1097, 1101–02, 67 L.Ed.2d 220 (1981), the Supreme Court found that these dangers can rise to the level of a deprivation of due process:

> Courts and commentators have recognized the inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party, particularly when the third party is the operator of the alleged criminal enterprise. One risk is that the lawyer will prevent his client from obtaining leniency by preventing the client from offering testimony against his former employer or from taking other actions contrary to the employer's interest.

Benefactor payments potentially strike at the heart of the attorney-client relationship, and thus at the heart of the adversarial process. Shargel denies having received such payments, but the evidence raises genuine issues as to whether his testimony should be accepted. His practices concerning the preservation and preparation of fee records deprives him of any documentary support for negating the appearance of impropriety created by his conduct and Witness A's testimony.

Furthermore, the law disfavors behavior such as Shargel's destruction of his records. Shargel testified that he destroyed his appointment and activity diaries soon after the Supreme Court's decision in *United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984), that the fifth amendment provides no privilege against the compelled production of voluntarily prepared business records. This action, given the close temporal proximity of the decision in *Doe* and the superseding indictment in this case, raises ethical, if not legal questions. N.Y.Penal L. § 215.40(2) (McKinney 1975) makes it a felony for a person, "[b]elieving that certain physical evidence is about to be produced or used in an official proceeding or a prospective official proceeding, and intending to prevent such production or use, [to suppress] it by any act of concealment, alteration or destruction...." No strictly analogous federal provision presently exists, *see* Note, *Legal Ethics and the Destruction of Evidence*, 88 Yale L.J. 1665, 1669–70 (1979), though the laws against obstruction of justice contemplate criminal prosecution for the destruction of subpoenaed documents, *see United States v. Walasek*, 527 F.2d 676, 679–80 (3d Cir.1975). In any event, the evidence raises the possibility that Shargel destroyed records believing they were relevant evidence in an imminent judicial proceeding, *cf.* Note, *Legal Ethics and the Destruction of Evidence*, 88 Yale L.J. at 1675, and conduct that creates a tenable basis for such an inference should be discouraged. *Cf. Model Rules of Professional Conduct* Rule 3.4(a) and comment (1983) (lawyer should not unlawfully destroy a document having potential evidentiary value in a pending proceeding or one whose commencement can be foreseen); D.C.Bar Ethics Op. 119 (1983), *reprinted in Lawyers' Manual on Professional Conduct* (ABA/BNA) 801:2307.

Shargel's decision to avoid keeping any records concerning fees is less serious than his outright destruction of preexisting appointments records. Shargel had no obligation to keep records of his appointments or fee arrangements, and he could not be disqualified simply because he adopted practices to avoid the creation and retention of evidence that might prejudice his clients. But, as noted in *Shargel II*, while an attorney may protect his clients by failing to keep proper records, he leaves himself open to allegations of improper behavior by the very clients he may have been attempting to protect. These allegations, however untrue, will be far more likely to create a credible appearance of impropriety in the absence of proper records, than if the attorney has followed record keeping practices that are standard in the legal profession. Furthermore, the proposition that an attorney will in fact serve the interests of his clients by failing to keep records of their contacts and of the fees paid is questionable. If the payments made to Shargel were proper, as he claims, he would have done both his clients and himself good service by maintaining complete records, since his failure to maintain those records has itself now become evidence against his clients. Shargel's practice of keeping no fee records or diaries may well serve his clients' interests if they had in fact been making benefactor payments, suggesting the existence of a criminal enterprise, or had been engaging in other improper conduct which such records would tend to prove. But the law flatly prohibits an attorney from assisting his clients in illegal or improper behavior. *See* DR 7–102(A)(7).

■ Shargel's meetings with Witness A at the MCC, as described in that witness' as yet uncontroverted testimony, also represent conduct which the law does not and

should not encourage. DR 7–104(A)(2) states that:

> During the course of his representation of a client a lawyer shall not ... [g]ive advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of his client.

The recent *Model Rules of Professional Conduct* strengthen this proscription. Rule 4.3 provides that:

> In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding.

Witness A's account of Shargel's appearance at the MCC suggests that Shargel was there representing persons other than Witness A. If so, Shargel had no right to question A under circumstances that deprived A of his right to advice from an attorney with A's interests exclusively in mind. The law recognizes no valid interest in an attorney's efforts for his client when they extend to attempts to influence a non-client who is not represented by independent counsel. *Cf. ABA Standards for Criminal Justice: The Defense Function*, Standard 4–4.3(c) (1980) (*"ABA Standards"*) (a lawyer should not "discourage or obstruct communication between prospective witnesses and the prosecutor"). Furthermore, if A's description is correct, then Shargel's informing A that Hoffman was to be his attorney could be construed as having been intended to deprive Witness A of his right to an attorney who would effectively represent his own interests. An attorney could not properly participate in a plan whereby his actual client chooses a lawyer for an incarcerated, potential codefendant, and pays his fees with a view to monitoring or discouraging the codefendant's cooperation with the government.

The government argues that, taken together, Shargel's conduct and the allegations of Witness A could lead a jury to conclude that Shargel has been acting as a sort of "house counsel" to a criminal organization. A recent study of the conduct and activities of attorneys for criminal organizations lends support to the government's position, suggesting a pattern of conduct consistent with those aspects of Shargel's behavior that have thus far been examined. *See* Staff of President's Commission on Organized Crime, *Materials on Ethical Issues for Lawyers Involved with Organized Crime Cases* at 4–7 (1985) (finding that members of La Cosa Nostra families are "required to have lawyers trusted by the Family"; that "more often than not the attorney's fees are paid by third parties"; that "[a]lmost invariably fees are paid in cash"; that "[c]ertain defendants would be represented for a nominal fee since the attorney had already been paid from another source"; and that "[t]he attorney is expected to, and will, inform the boss when a client is suspected of cooperating with the government").

■ RICO does not criminalize mere membership in or association with a criminal enterprise. *United States v. Russotti*, 555 F.Supp. 1236, 1241 (W.D.N.Y.), *aff'd* 717 F.2d 27 (2d Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1273, 79 L.Ed.2d 678 (1984); *cf. Amusement Devices Ass'n v. Ohio*, 443 F.Supp. 1040, 1049–53 (S.D.Ohio 1977) (three-judge court) (holding unconstitutional Ohio statute that prohibited furnishing legal services to a "criminal syndicate" for the purpose of maintaining the syndicate). The law recognizes, however, that when a lawyer behaves in a fashion that affirmatively promotes the continued existence of a criminal enterprise—by enabling it, for example, to conceal its existence or deter potential defections from its ranks—his behavior is at least unethical, and may be criminal. "Courts have recognized that an enormous change occurs when an attorney becomes a participant in establishing fact situations rather than taking them as he finds them." Note, *Legal*

*Ethics and the Destruction of Evidence,* 88 Yale L.J. at 1679. Lawyers ought not to act as "house counsel" to any criminal enterprise, because in doing so they aid in the commission of criminal activity:

> For a lawyer to represent a syndicate notoriously engaged in the violation of the law for the purpose of advising the members how to break the law and at the same time escape it, is manifestly improper.... Where a lawyer accepts a retainer from an organization, known to be unlawful, and agrees in advance to defend its members when from time to time they are accused of crime arising out of its unlawful activities, this is equally improper.

ABA Comm. on Professional Ethics and Grievances, Formal Op. 281 (1952); *see ABA Standards, supra,* Standard 4–3.7, commentary at 4.49–50 ("it is obviously unprofessional conduct for a lawyer to enter into an arrangement with those engaged in organized crime to provide representation on a regular basis to the participants. The lawyer who agrees to represent a person against [such future charges] is encouraging illegal activity by his or her willingness to defend").

A particularly instructive decision on this subject is *In re Abrams,* 56 N.J. 271, 266 A.2d 275 (1970), where the New Jersey Supreme Court stated that "it need hardly be [be]labored that an attorney may not agree with an illegal syndicate to represent its members or employees with respect to future violations of the law." *Id.* at 274, 266 A.2d at 277. The Court explained:

> Such conduct not only obstructs justice, but prevents the due administration of law.... An attorney may defend persons accused of participating in the numbers racket as writers, pickup men, or bankers, and their clients need not be limited. It is not the number of persons defended that counts, but is the regularity, character, and purpose of employment. When the purpose is to guide and aid a combination of persons engaged in crime, an attorney becomes part of the criminal system. Where a large number of cases of the same kind of crime are regularly defended by the same lawyer, where the defendants do not know and never have seen the lawyer prior to the moment of representation, and where the attorney's fees are paid by men known to be the leaders of a criminal system, a court may not only infer knowledge on his part of the criminal combination, but, from the frequency of his performance and knowledge, conclude that he becomes an actual participant therein.

*Id.* (quoting *In re Disbarment Proceedings,* 321 Pa. 81, 184 A. 59 (1936)). The pattern of attorney conduct observed and condemned by the Court in *Abrams* included the forms of behavior noted in the Commission's *Staff Report* on "mob lawyers." There, too, the Court found evidence that an attorney had taken on clients who had not sought his representation, for fees paid by third parties who were engaged in criminal activities.

Whatever the reality of Shargel's practice, this review of the evidence concerning his conduct makes clear that his disqualification will not deter appropriate attorney behavior. The evidence presented about Shargel's admitted behavior, together with the testimony of alleged associates of his present and former clients, creates an appearance that enables the government to argue that he is an attorney who serves and has an intimate connection with a criminal enterprise. This appearance of impropriety reflects conduct that should be discouraged, both because it is inherently unethical and because it poses a significant danger to defendants at a trial in which one of the contested issues will be the existence of a criminal enterprise. By conducting his practice in a way which suggests the existence of a criminal enterprise, Shargel has undermined his usefulness to Mastrangelo in this case, while at the same time making himself potentially useful to the government. *Cf. ABA Standards, supra,* Standard 4–1.1(c), commentary at 4.9 (The "pernicious idea [that a lawyer should be an alter ego of his client] is destructive of the lawyer's usefulness. The lawyer's value to each client stems in large part from the

lawyer's independent stance, as a professional representative rather than as an ordinary agent."). Permitting attorneys to act as Shargel is alleged to have acted, by precluding the government from calling them as witnesses or presenting evidence about their actions, would ill serve the goals of ethical and effective representation, as well of the full and fair enforcement of substantive criminal law.

### III. Conclusion.

The evidence that has come to light during the court's consideration of this motion presents a disturbing picture of the appearance both of practices designed to hide the nature and cost of the services provided by an attorney and of acts calculated to exploit the special privileges of attorneys on behalf of an alleged criminal enterprise. The courts owe to those attorneys who appear before them in criminal cases, particularly cases under RICO, a clear message that the types of conduct in which Shargel engaged or is alleged to have engaged can readily result in their becoming witnesses for the government or for their own clients. The lack of clear guidance that currently exists in this field must soon be rectified, so attorneys seeking to represent their clients effectively can regulate their activities to protect their client relationships, and also to protect themselves from becoming the objects of ethical or criminal proceedings. *See, e.g., United States v. Loften*, 518 F.Supp. 839, 854–55 (S.D.N.Y.1981). Shargel's conduct raises a credible appearance of impropriety for the reasons described above, and the criminal-defense bar must carefully weigh whether such conduct will actually serve their interests and the overall goal of effective representation.

■ Because the sole basis on which Shargel is disqualified is the distortion of the factfinding process that his appearance at counsel table might engender, he is disqualified only from participating at the trial of this action. Shargel may continue to participate fully in the pre-trial stage of this case, and Mastrangelo's trial counsel and other defense counsel are free to con-

sult with him during the course of the trial itself. *Cf. Cunningham*, 672 F.2d at 1074 (court may limit disqualification simply to sitting at counsel table and appearing as counsel of record); *In Re Grand Jury Subpoena Duces Tecum Dated January 2, 1985 (Robert M. Simels, Esq.)*, 605 F.Supp. 839, 853 (S.D.N.Y. Mar. 11, 1985) (if counsel is called as witness concerning fee arrangement, "court could order a limited disqualification and allow [counsel] to continue to assist with ... defense, but not appear at counsel table in front of the jury"). But, under the circumstances detailed above, Shargel cannot be permitted to appear before the jury as Mastrangelo's lawyer.

SO ORDERED.

### ON MOTION TO PREVENT DISCLOSURE

■ Defense counsel have moved to keep sealed, pending the selection of the jury in this case, two opinions relating to the disqualification of Gerald L. Shargel. *United States v. Castellano*, No. SSS 84 Cr. 63 (ADS) (May 1, 1985); *United States v. Castellano*, No.. SSS 84 Cr. 63 (ADS) (Mar. 5, 1985). The opinions deal with an ongoing effort by the government to obtain evidence from Mr. Shargel. That effort has already resulted in two published opinions. *See In re Shargel*, 742 F.2d 61 (2d Cir.1984); *In re Grand Jury Subpoena Duces Tecum*, No. M11–188 (S.D.N.Y. Apr. 26, 1984). Although no member of the public has yet moved to obtain these recently completed opinions, an order keeping them under seal should be entered only if such an order would be appropriate in the event such a request were made. Here, no adequate basis would exist for refusing a request for public disclosure.

The Second Circuit "recognize[s] some degree of First Amendment access to pretrial proceedings." *In re Application of the Herald Co.*, 734 F.2d 93, 98 (2d Cir. 1984). *Herald Co.* does not provide an exhaustive definition of "pretrial proceed-

ings," but "[t]here is no reason to distinguish between pretrial proceedings and the documents filed in regard to them." *Associated Press v. United States District Court*, 705 F.2d 1143, 1145 (9th Cir.1983); *see also Nixon v. Warner Communications, Inc.*, 435 F.2d 589, 597–99 (Cust. & Pat.App.1978) (discussing "general right" of access to judicial records).

*Herald Co.* permits nondisclosure of pretrial proceedings "only upon a showing of a significant risk of prejudice to the defendant's right to a fair trial or of danger to persons, property, or the integrity of significant activities entitled to confidentiality...." 734 F.2d at 100. To the extent that disclosure of materials, such as grand jury proceedings or the identity of witnesses, poses dangers to the interests of the government or of third parties, the opinions avoid such disclosures. In addition, the evidentiary hearing on the motion was held *in camera* because of security concerns. Such safeguards provide adequate protection of these interests.

Defendants argue, however, that their sixth amendment interests can only be protected by nondisclosure of the opinions themselves. They believe that publication of the opinions will attract widespread media attention. Moreover, they suggest that the media reports may distort the holding of the two opinions, transforming them into an endorsement by the court of the government's theories regarding Mr. Shargel's activities. They claim that publication of the opinions will therefore undermine their ability to obtain a fair and impartial jury.

The mere possibility of publicity concerning the opinions is insufficient to meet the burden of showing a significant risk of prejudice. As *In re Application of National Broadcasting Co.*, 635 F.2d 945, 953 (2d Cir.1980), noted, "[d]efendants, as well as the media, frequently overestimate the extent of the public's awareness of news." The Court went on to state that even in the Watergate prosecutions—where the publicity was far more extensive than that demonstrated by the defendants in their motion for a continuance of the trial here—media reports "did not prevent the selection of jurors without such knowledge of the events as would prevent them from serving impartially." *Id.* The cure for the danger to which defendants point is an extensive voir dire. *Id.; see Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 563–65, 96 S.Ct. 2791, 2804–06, 49 L.Ed.2d 683 (1978).

Moreover, the opinions, even if they do receive public attention, seem unlikely to cause any actual prejudice. First, they deal with technical issues. Furthermore, the government intends to present to the jury the evidence and arguments discussed in the opinions, probably in less measured terms than those used by the court. Thus, this is not a case in which the jury would otherwise not be exposed to the information at issue. The jury in this case will also be exposed to evidence that is far more likely to gain its attention—including the details of some 26 murders—than the material in the two opinions pertaining to Mr. Shargel. Finally, the government has indicated a desire to use the most recent decision in ongoing litigation. Keeping these opinions under seal, for at least several months, might deprive other defense attorneys of guidance that would enable them to avoid disqualification.

Under the circumstances of this case, defendants have failed to justify an order preventing disclosure of the opinions, so the two opinions are ordered unsealed.

SO ORDERED.